Calvin G. **BARNHART**, Plaintiff,

v.

**AMERICAN OIL COMPANY**, Defendant.

Civ. A. No. 857.

United States District Court E. D. Virginia, Newport News Division.

Jan. 22, 1965.

Ralph T. Baker, William McL. Ferguson, Newport News, Va., for plaintiff.

Vandeventer, Black, Meredith & Martin, Hugh S. Meredith, Norfolk, Va., for defendant.

WALTER E. HOFFMAN, Chief Judge.

On January 29, 1960, the plaintiff, a tank-truck driver employed by J. W. Hornsby's Sons, Inc. (Hornsby), was injured when he fell from the top of a gasoline tank-truck owned by Hornsby, while plaintiff was in the process of loading fuel oil at the Yorktown Refinery of the defendant, American Oil Company.

Aside from the question of damages the issues are (1) whether plaintiff was a "statutory employee" of American Oil Company by reason of American's relationship with Hornsby; (2) the negligence if any, of American Oil Company; and (3) the contributory negligence, if any, of plaintiff Barnhart. We will consider these issues in the order stated.

The defendant urges that, by reason of the close relationship between American and Hornsby, the latter's employees are American's employees as well and that American is entitled to the umbrella of protection afforded by the Virginia Workmen's Compensation Act, § 65–1 et seq., Code of Virginia, 1950, as amended, in that plaintiff was engaged in carrying on the trade, business or occupation of American when the accident took place. To appreciate this contention it is necessary to examine the relationship existing between American and Hornsby.

The last written contract between Hornsby and American is dated June 4, 1953, at which time American maintained a terminal at Norfolk. While there have been some modifications of the contract which continues to run on a year to year basis, and American has constructed its Yorktown Refinery in the interim period, the arrangement existing at the time of plaintiff's accident is essentially the same. The contract refers to American as the "seller" and Hornsby as the "buyer". It provides that title to the product and the risk of loss passes to Hornsby when the product enters the tank cars of Hornsby, F.O.B. American's shipping points. It states that Hornsby's equipment must be painted in American's colors and should display American's trade names in accordance with American's approved standards.

Hornsby operates a fleet of service stations handling Amoco products throughout the Peninsula area. Three or four filling stations were leased to Hornsby by American but the latter had nothing to do with the operation of the business at these leased stations. The remaining stations, approximately 60 in number, were owned by Hornsby. As may be anticipated, American had nothing to do with the hiring or firing of any of Hornsby's employees and the tank-truck drivers were under no orders from American. Hornsby's employees were exclusively on Hornsby's payroll; their salaries and hours of work were fixed by Hornsby; their routes and destination points were according to Hornsby's needs and directions. As noted above, when the defendant's product was placed in a Hornsby truck, it then belonged to Hornsby. The price was fixed by Hornsby and all cost of delivery of the fuel product was assumed by him.

At rare intervals Hornsby was requested to deliver American's products to the latter's large national accounts. In such event Hornsby was contacted and he would fix the charges for these deliveries.[1] However, Hornsby was not a contract hauler.

American maintains and operates several bulk storage plants throughout Eastern Virginia. The Yorktown Refinery ships petroleum products by common carrier to these bulk storage plants, from which point the customary method of distributing is through jobbers like Hornsby. On shipments made from Yorktown to the bulk storage plant, title

---

1. It is not considered that the product flowing into the tank-truck at the time of the accident was destined for one of American's national accounts.

to the product remained with American until such time thereafter as it was sold to the jobber who, in turn, resold the product to the filling station.

American furnished all of the large torsional signs at Hornsby's service stations (whether leased or owned by Hornsby). It likewise supplied the plastic decal "bellybands" that go around the fuel pumps. All jobbers such as Hornsby were required to use the name "American" and to paint the station's appurtenances in American's colors. With respect to advertising, it is generally a three-way split with American assuming part of the cost, Hornsby assuming a portion of same and Hornsby's dealer (or lessee of the filling station) taking over the balance of the cost. There are approximately 62 American owned and operated filling stations throughout Virginia.

■ Defendant, contending that Barnhart was not a stranger to the business of American and that his sole remedy is under the Virginia Workmen's Compensation Act, points to this close relationship with Hornsby and argues that American's business was the sale and distribution of fuel products. It is, of course, the settled rule in Virginia that one who is engaged in the trade, business or occupation of another, when engaged as a subcontractor, falls under the protective canopy of the Workmen's Compensation Act. In certain instances this is true even if the party is an independent contractor. Walker v. United States Gypsum Co., 4 Cir., 270 F.2d 857, cert. den. 363 U.S. 805, 80 S.Ct. 1240, 4 L.Ed.2d 1148; McCann v. Newport News Shipbuilding and Drydock Co., E.D.Va., 177 F.Supp. 909; Doane v. E. I. DuPont de Nemours & Co., 4 Cir., 209 F.2d 921; Rea v. Ford, 198 Va. 712, 96 S.E.2d 92; Williams v. E. T. Gresham Co., 201 Va. 457, 111 S.E.2d 498; Lucas v. Biller, 204 Va. 309, 130 S.E.2d 582.

In Floyd v. Mitchell, 203 Va. 269, 123 S.E.2d 369, the plaintiff's intestate was an employee of Glamorgan Pipe and Foundry Company. Mitchell, the defend-ant, was an employee of Powell, a contract carrier, who had been hired by Glamorgan to load and haul pipe. Plaintiff's intestate assisted Mitchell in the loading operation and, in addition, a Glamorgan crane operated by Glamorgan's employees was used to assist in loading the pipe. While on Glamorgan's yard, plaintiff's intestate was killed when Mitchell backed a tractor over him. Plaintiff brought suit against Mitchell and Powell. In holding that Mitchell was performing a task which was a part of Glamorgan's trade, business or occupation, and that the rights of plaintiff's intestate were governed by the Workmen's Compensation Act, the Supreme Court of Appeals stated the rule as follows:

"The test is not whether the owner, by engaging an independent contractor to perform some part of his business, thereby engages in the business of the independent contractor. It is whether the independent contractor is performing work that is part of the trade, business or occupation of the owner."

Stated otherwise, as applied to this case, was Hornsby engaged in performing work that was a part of the trade, business or occupation of American?

Substantially the same language as quoted above from Floyd v. Mitchell, supra, will be found in Sears Roebuck & Co. v. Wallace, 4 Cir., 172 F.2d 802.

In Anderson v. Thorington Construction Co., 201 Va. 266, 110 S.E.2d 396, the plaintiff was a consulting engineer while working on the Richmond-Petersburg Turnpike. The defendant, also an independent contractor, was doing work on the same project. The court held that both the plaintiff and defendant were engaged in the trade, business or occupation of the Turnpike Authority, and since neither was a "stranger" to the work, the litigants and the Authority were under the canopy of the Workmen's Compensation Act, and the defendant-contractor was not an "other party" within the meaning of the Act pertaining to rights of an injured employee against an "oth-

er party." Cf. Sykes v. Stone & Webster Engineering Corporation, 186 Va. 116, 41 S.E.2d 469.

We fully recognize that the line of demarcation in these matters is indeed narrow. Under certain circumstances it may conceivably be extended to the point of no return. For example, A. C. Shackelford & Son distributes American's products in Gloucester and Mathews counties as a sub-distributor under Hornsby, but has no direct relationship with American. When Shackelford sends its tank-trucks to American's Yorktown Refinery, the product is billed to Hornsby who, in turn, bills Shackelford. Hornsby, operating a substantial business on the Peninsula between Hampton and Richmond, could establish a chain of sub-distributors and, according to the defendant, each employee of a sub-distributor would become a statutory employee of American, even though American has no right of control or direction as to the amount of products accepted and/or delivered by Hornsby or any sub-distributor; nor did American have anything to do with the selection of site locations for the retail sale of its products.[2] Moreover, Hornsby, maintaining its independent status, has never handled batteries, tires and accessories for or in behalf of American; Hornsby having elected to formulate and operate the Hornsby Tire Company in competition with American which handles the Atlas tire. Manifestly it cannot be successfully urged that a filling station attendant, injured while engaged in pumping fuel oil from a Hornsby tank-truck into a filling station tank, would be a statutory employee of American; whereas the same attendant, injured while changing a customer's tire and replacing same with a Hornsby tire, would not fall within the same category.

Undeniably American is engaged in the business of producing and marketing gasoline and petroleum products and, while its ultimate objective is to place its products in the hands of the consumer public, this is true as to every manufacturer of a product, whatever the nature of the same may be. It does not follow that the salesman handling a manufactured product which reaches the consumer public through a retail store is the statutory employee of the manufacturer who, of necessity, is vitally interested in the various methods of distribution. We need not concern ourselves with American's salaried employees located at Richmond and Norfolk and the fact that salaried loaders fill their American owned trucks at Yorktown for transmittal to the bulk plants at these locations. Nor are we involved with commission jobbers handling American products on a commission basis in certain assigned areas. We are not impressed by the fact that American, as is true with all large fuel oil companies such as Humble (Esso), Gulf, Shell, Texaco, Phillips, Socony and others, issue credit cards which places the ultimate responsibility of collection of individual accounts upon the parent company.

In the event of a price war, American cooperates with Hornsby after initially making a thorough study of the market and existing conditions. To protect its corporate image and meet competition, American may offer Hornsby a comparable allowance to permit Hornsby to offer his dealers a competitive price. In such event, both American and Hornsby share a portion of the reduced price.

■ In the final analysis we think that the passing of title or ownership of the fuel oil from American to Hornsby is the most important single factor in determining whether Barnhart was a "stranger" to American's business, trade or occupation. The converse of this situation confronted the Louisiana court in Maryland Casualty Co. v. Gulf Refining Co., La.App., 110 So.2d 784. In that case the employee tank-truck driver of a distributor was injured when an explosion occurred while unloading gasoline at a

2. American does cooperate with Hornsby through American's real estate department by making appraisals on site locations, etc., but the ultimate responsibility in purchasing or leasing a filling station site rests with Hornsby.

filling station owned by Gulf and leased to another party. The distributor was an independent contractor engaged for the purpose of distributing Gulf's products on the wholesale level to various retail outlets. The title to the fuel product remained with Gulf during the entire operation, and it is apparent that the injured party was a mere conduit between two phases of Gulf's operations. The Louisiana court held that the injured employee and the distributor were performing a part of the trade, business or occupation of Gulf. Other cases involving injuries to employees of independent truck carriers in which the manufacturer of the product, retaining title to the product, has been held liable are Hopkins v. Darlington Veneer Co., 208 So. Car. 307, 38 S.E.2d 4, and Chavis v. E. I. DuPont de Nemours & Co., 4 Cir., 283 F.2d 929. In Kent v. Shell Oil Company, 5 Cir., 286 F.2d 746, the plaintiff truck driver was injured when pipe to be unloaded from his truck fell upon him. The evidence established that Shell also transported its pipe in Shell trucks and, therefore, plaintiff's work was a part of Shell's business. The pipe, of course, remained the property of Shell and, once again, we have the situation in which the injured employee was a mere conduit engaged in transporting Shell's material from one place to another. Along similar lines we find Huffstettler v. Lion Oil Co., W.D.Ark., 110 F.Supp. 222, in which Lion Oil Company owned a bulk plant which was operated under contract by plaintiff's employer, Taylor. Plaintiff was injured when an explosion occurred while he was transferring gasoline from the defendant's storage tank to a truck owned by Taylor and operated by plaintiff. The petroleum products were being shipped by Lion Oil Company to itself at the bulk plant. Title or ownership of the fuel products remained with Lion until actual delivery to the retail customer, and these retail establishments were all under contract with Lion and had no contractual relationship with Taylor. The latter's compensation was on a commission or percentage basis of products sold, and all funds collected by Taylor were transmitted directly to Lion. Prices were fixed by Lion who controlled every phase of the operation except the actual management of the bulk plant under the contract.

Perhaps it can be said that no authority precisely in point has been directed to the Court's attention. The reason is probably that no such an extension of the "statutory employer" doctrine has every heretofore been urged. We prefer to follow the rule enunciated in Perkinson v. Thomas, 158 Va. 699, 164 S.E. 561, wherein an award of compensation benefits was reversed when the injured employee of a seller of logs was held not entitled to compensation from a processor of logs since the relationship of the employer to the processor was simply that of buyer and seller of a commodity, the court stating:

"The relevant portion of the act refers to an owner who undertakes to perform *any work* which is a part of his trade or business and procures another to perform the whole or any part of *that work* which the owner had undertaken."

It must be remembered that in the area covered by Hornsby under his contract with American, only Hornsby could solicit business—American was forbidden to do so, except as to certain national accounts over which Hornsby had no control. Thus, excluding the national accounts, it was not a part of the trade, business or occupation of American to carry on business in the area allocated to Hornsby. American has elected to proceed with the distribution of its product by outright sale to an independent operator. What that operator thereafter does with the product and how much he receives from the sale of same is, at most, only of indirect concern to American. True, either party may cancel the contract according to the terms thereof and, to this extent, Hornsby is interested in maintaining the goodwill of American. But the reverse is also true as evidenced by American's statement that Hornsby's extensive business operations on the Pen-

insula were a factor in finally selecting Yorktown as the site for the new refinery.

■ This position is fortified by the recent opinion of Judge Albert V. Bryan in Bristow v. Safway Steel Products, 4 Cir., 327 F.2d 608, where, in referring to "any other party"—against whom the employee has a right of action—Judge Bryan said:

"Put another way, 'any other party' is one not required to pay, or not entitled to receive, compensation under the Act."

We cannot believe, under the facts of this case, that American could be required to pay compensation benefits to Barnhart; nor do we feel that Barnhart could successfully receive compensation benefits from American under the Virginia Workmen's Compensation Act.

We hold that American is not entitled to the protective coverage of the Virginia Workmen's Compensation Act by reason of Barnhart's receipt of compensation benefits afforded at the expense of Hornsby or his compensation insurance carrier.

Reverting to the facts of the accident for consideration of the issues of negligence and contributory negligence, as heretofore noted Barnhart took Hornsby's tank-truck to American's refinery for the purpose of getting a load of fuel oil. As was his daily custom, he would tell American's attendant on duty the quantity of product desired and then proceed to the loading rack. The attendant was under a duty to set the meter so that the proper quantity of fuel oil would be pumped into the truck; he activated the so-called lower valve to permit gasoline to go up to the upper valve; he likewise ascertained that the engine and radio were off and the ground wire was attached to the truck. The customary loading procedure required Barnhart to climb to the top of his truck, place the loading spout into the empty tanks, and then activate the flow of the product by pulling on a cord attached to a lever on the upper valve. This lever released the spring valve, thereby permitting the product to flow into the tank of the truck.

On the day in question Barnhart performed these duties. After completing the loading operation for tank No. 2 he inserted the spout into tank No. 3. He grabbed the cord or rope attached to the activating lever and pulled with both hands. The cord or rope came loose from the lever causing Barnhart to lose his balance and fall to the concrete a distance of approximately ten feet.

The defendant had notice of the fact that ropes had previously broken and that the knot in the rope had pulled through the eye of the lever. Apparently, on the day in question, the activating rope had slipped through the eye of the lever. Whether this was due to the rope becoming wet or soaked with oil, or whether the knot placed in the rope was insufficiently secured or of insufficient size, is not clear from the evidence. The rope was not produced at the trial. It is sufficient to state that the portion of the equipment which brought about the accident was within the exclusive control of American from a legal standpoint. No policy had ever been established as a safety feature with regard to fastening the rope; nor had any regulations or instructions been given to tank-truck drivers relative to loading the trucks or the extent of pressure to be applied in pulling the activating rope. While the drivers frequently replaced the ropes, it is generally conceded that this was American's duty.

■■ As a business invitee on the premises the duty to protect Barnhart was co-extensive with the invitation. Stated otherwise, the care owed to an invitee is parallel to the character of the invitation. Eastern Shore of Virginia Agricultural Ass'n v. Le Cato, 151 Va. 614, 144 S.E. 713. In the exercise of ordinary care under the circumstances it seems reasonably foreseeable that a tank-truck driver, stationed on top of his truck, is very likely to sustain an injury if the activating rope—which he is required to pull—is defective or otherwise insufficient. The driver was, to say the

least, engaged in a relatively dangerous occupation at the moment and was dependent to a great extent upon the safety of American's equipment. While periodic visual inspections of the loading rack area were made each time a truck entered the loading rack, such an inspection was, in effect, a "good housekeeping" procedure, or confined to a determination of whether the activating rope was "frayed". When interrogated as to the rope involved in plaintiff's accident, O'Bierne, the truck rack attendant, stated that he noted the rope only through visual inspection and in describing its characteristics said that "all the ropes were worn." O'Bierne admitted that it was easier and quicker to let the truck driver change the rope because of the difficulty in replacing same due to the height involved. Indeed, so many different people participated in changing ropes from time to time that it is difficult to fix the ultimate responsibility, except to say that it was American's duty and ultimate responsibility. The evidence discloses that rope changes were made by the truck drivers, the truck rack attendant, the plant maintenance crew, and Flour Maintenance Corporation, the latter being an independent contractor employed by American. The method of inspection, bearing in mind the hazards naturally flowing from a defective or insufficient rope, do not meet the standards of ordinary care under the circumstances. The Court finds that American was negligent and that such negligence proximately resulted in plaintiff's accident.

We turn to the issue of contributory negligence. American argues that there was an overhead grab bar which Barnhart should have held with one hand, using the other hand to pull the activating rope. At one point in the testimony the plaintiff testified that there was no grab bar present when he was injured but, immediately thereafter, he testified that there was a bar—about head high—

that the loading spouts were connected to by straps hanging down from the bar. The bar apparently ran from one end of the bay to the other. Subsequent to the accident, the bar was removed [3] but the Court declined to permit evidence of precautions taken after the accident to support the theory of antecedent negligence. Whitten v. McClelland, 137 Va. 726, 120 S.E. 146. We are now urged to consider this evidence to negative any contention of contributory negligence; the reasoning being that American, contending as it does that the bar was intended to be a safety device to permit the truck drivers to hold while pulling the rope, has removed the bar since the accident. Our attention is directed to an annotation appearing in 64 A.L.R.2d 1296 listing exceptions to the general rule of inadmissibility. It is there stated that evidence of a changed condition since the accident may be considered (1) as rebuttal or impeachment of a witness, Virginia & N. C. Wheel Co. v. Harris, 103 Va. 708, 49 S.E. 991; (2) as an explanation of measurements, maps, photographs, etc., Henwood v. Chaney, 8 Cir., 156 F.2d 392, cert. den. 329 U.S. 760, 67 S.Ct. 113, 91 L.Ed. 655; (3) as an aid to identification, Bailey v. City of Asheville, 180 N.C. 645, 105 S.E. 326; (4) as evidence showing the condition of the place or thing involved at the time of the accident, Choctaw O. & G. R. Co. v. McDade, 191 U.S. 64, 24 S.Ct. 24, 48 L.Ed. 96; (5) as evidence of changed conditions, Redman v. Community Hotel Corp., 138 W.Va. 456, 76 S.E.2d 759; and (6) as evidence showing that defendant had control of the premises, Orr v. Dawson Tel. Co., 35 Ga.App. 560, 133 S.E. 924. Plaintiff likewise relies upon Johnson v. United States, D.C.Mont., 163 F.Supp. 388, wherein changes made on a fence surrounding an electrical substation subsequent to death of plaintiff's intestate were admitted for the sole purpose of showing the practicability of an additional safeguard, but not as evidence of negligence on the part of the defendant.

---

3. It is suggested that the removal of the bar was due to American installing telescopic loading spouts instead of double-jointed spouts.

■ Plaintiff's argument is persuasive and, to the extent of its possible admission for the sole purpose of rebutting contributory negligence, it is indeed tempting to engraft another exception to the general rule. Manifestly, plaintiff owed a duty to exercise reasonable care for his own safety. Where the defendant, subsequent to the accident, removes the bar which it contends plaintiff was under a duty to hold while pulling on the rope, it seems appropriate to suggest that the bar was not a safety device. We think, however, that it is unnecessary to invoke this exception to the general rule. Defendant's witness, Melancon, testified that the bar was twenty-two inches off the center of the truck toward the eave of the roof. The truck driver would sit or stand in the center of the island on the top of the truck and, when pulling the lever rope, he would be facing in the opposite direction from the bar. Additionally, unless the driver desired a full load in a particular tank, he would be required to watch a meter off the side of the truck located at a point approximately forty-two inches off the ground. It is, at best, only an argument that plaintiff, in the exercise of ordinary care on his part, should have held onto the bar, referred to by defendant's witnesses as a "grab bar", and, at the same time, pulled the rope. Bearing in mind that no instructions or regulations were given to the truck drivers, and considering that the burden is upon the defendant to establish the contributory negligence of the plaintiff by a fair preponderance of the evidence, unless such contributory negligence is revealed by the plaintiff's own evidence or may be fairly inferred from all the facts and circumstances, we must conclude that the burden has not been met and the plaintiff was free from contributory negligence.

■ Approaching the question of damages, it should be first noted that no medical bills were introduced in evidence.

Presumably these expenses were paid by Hornsby or its compensation insurance carrier. No petition has been filed for reimbursement of these expenses, and it may be assumed that none is contemplated. Since this is an action against a third-party tortfeasor, the Virginia law permits the party required to pay such expenses to be reimbursed. Indeed, under § 65–39 of the Code of Virginia, 1950, as amended, it appears to be mandatory under the Act to require the judgment debtor to pay such expenses out of the judgment. Since the Court does not have before it any evidence of medical expense, none has been ascertained. Under such circumstances it is assumed that plaintiff will receive the entire award herein made, less his attorney's fees and nonrecoverable costs in connection with this litigation. If counsel are of a different opinion, the Court will, on motion, reopen the evidence to permit the introduction of such expenses, in which event the award to the plaintiff will be increased by the exact amount of proven medical expenses.

■ As to any claim for loss of wages, the record discloses that plaintiff was paid his regular salary of $85.00 per week during his disability which began on the date of the accident of January 29, 1960. He returned to work at a desk job on February 24, 1960, and resumed his duties as a truck driver-salesman around the first part of April. He left Hornsby during the week following Thanksgiving, 1961, and commenced work at the Newport News Shipbuilding & Drydock Corporation on or about December 4, 1961, at which time he was earning $88.00 per week. As of July 23, 1962, he was on a salary of $101.20 per week for a forty-hour week—apparently a better position than he had with Hornsby. No attempt has been made, in the briefs or otherwise, to make claim for the reasonable value of services from January 29, 1960, to February 24, 1960, under the collateral source rule. The Court, therefore, finds that plaintiff sustained no loss of wages.

■ It is true, of course, that any measure of damages is properly dependent upon diminution of earning capacity, and not merely the amount actually earned. Aivaliotis v. S. S. Atlantic Glory, E.D.Va., 214 F.Supp. 568, 576; Lawrence v. Norfolk Dredging Co., 4 Cir., 319 F.2d 805. We must consider to what extent, if any, the injuries will adversely affect plaintiff's future employment possibilities. The factor in this case is not particularly significant but should not be overlooked entirely.

When plaintiff fell from the top of the truck to the concrete, he sustained a contusion of the posterior scalp and pain with motion, together with some mild swelling of the *right* foot. X-rays of the *right* foot were negative. We may assume that the foregoing injuries were essentially *de minimis* and no further reference to same will be made.

The principal complaint resolves itself around the *left* foot. When examined by Dr. Stanton the day of the accident, plaintiff had extreme pain with marked swelling and tenderness of the left foot. An X-ray revealed a fracture of the first metatarsal bone—in the area of the arch of the foot. The foot was placed in a cast from just below the knee to the end of the toes. He was advised to rest, elevate his foot, and apply ice. He was given pain relieving medication. The foot was bluish in color indicating a bleeding from broken blood vessels. On February 3, 1960, the cast was loosened and later reapplied. It was subsequently removed on February 22. The orthopedic surgeon noted that the toes turned up in what was described as a "cock-up deformity." Plaintiff used crutches from the day of his accident, with instructions not to permit weight bearing, but on February 28 he became ambulatory and started weight bearing. He discarded his crutches on March 14. At that time it was observed that plaintiff was walking on the outside of his foot; the ball of the foot was still swollen, and the deformity in the toes continued to exist. Shortly thereafter

he was placed in an elastic support for the ankle and foot; he was also given an arch support for both shoes. Even this remedial support did not permit him to bear his full weight. Subsequently a metatarsal bar was applied to the sole of the shoe to correct the condition caused by walking on the outside of the foot, but this was not successful.

On June 24, 1960, there was some improvement as to swelling but no improvement in the "cock-up" condition of the toes and no apparent improvement as to the amount of pain or ability to walk on the entire ball of the foot. Plaintiff was advised to exercise.

An examination shortly prior to trial—approximately two years later—disclosed that Barnhart continued to walk on the outside of his foot; he stands with his feet turned inward; his shoes had been worn down from the outer aspect of the sole, but the inner aspect was hardly worn at all; his toe deformity remained as before, but the swelling of the ball of the foot had disappeared. There remained some mild enlargement of the foot and, subjectively, plaintiff still complained of soreness on the ball of the foot.

Dr. Stanton gives a 30% permanent-partial disability rating of the left leg and foot. He expresses the opinion that plaintiff will continue to have pain or soreness in the ball of the foot, which will not correct itself through natural processes. He concedes that plaintiff has had a tendency to exaggerate the "claw toe" deformity of the foot but otherwise states that the complaints are compatible with the injury. Plaintiff is, according to Dr. Stanton, able to work but is limited in that he cannot climb in high or dangerous places as such activities require a normal foot for good balance.

Plaintiff was examined by a neurological surgeon who expressed the view that there was no direct involvement of the nerves. For what it may be worth, the prognosis for improvement was described as poor.

Dr. Duncan, an outstanding orthopedic surgeon, examined plaintiff a few days prior to the trial at the request of defendant. He stated that plaintiff's toes were tight or stiff and he refers to this as plaintiff's only deformity which he states to be a "slight hyperextension." There is some slight atrophy in the muscles of the calf. He could feel some enlargement of the metatarsal area underneath the ball of the foot. He testified that the atrophy would lessen with use, and that plaintiff *may* get some improvement of the stiffness in the toes. He feels that plaintiff still has some pain and, like Dr. Stanton, he indicates that this is really more soreness than pain. He concedes that if plaintiff stands for eight hours or more, this will cause much discomfort. Dr. Duncan did not know that Barnhart walked and bore weight on the outside of his foot. He rated the disability at 5% permanent-partial of the left foot.

Plaintiff's present occupation is that of "instrument man" in the plant engineering department. As such, he operates a transit and level. He does some climbing from deck to deck on vessels being constructed or repaired at the shipyard. There is every indication that his employment is permanent and, except for some soreness after remaining on his feet for any appreciable period, he is not functionally disabled.

There is a decided difference in the rated disability as expressed by the two highly qualified orthopedic surgeons. The Court believes that a more realistic rating of disability to the left foot would be from 15% to 20% permanent-partial. His future earning capacity should not be seriously impeded. Under all the facts and circumstances, we think that a fair award for plaintiff's injuries should be fixed at $11,000.00.

Counsel will prepare and present a judgment order in accordance with this memorandum.