LAW AND EQUITY COURT OF THE CITY OF RICHMOND

F. Robert Loftis, Admr. of the
Estate of Francis J. Loftis, deceased

　　　v.

Chesapeake Corporation of Virginia

December 20, 1972

By JUDGE A. CHRISTIAN COMPTON

Enclosed you will find a copy of the order entered today which sustains the defendant's plea to the jurisdiction and dismisses this action.

The special plea was separated for trial and was tried to a jury over the objection of the defendant, which took the position that no issue of fact was involved. The jury were unable to agree on a verdict and following their discharge, the defendant renewed its motion for summary judgment on the plea which the court now sustains.

The plaintiff still maintains that he is entitled to a jury trial on this jurisdictional issue. In view of what will be set out, infra, a ruling on that point here is unnecessary. A discussion of this question and the present state of the Virginia law thereon by Judge Haynesworth is found in Walker v. United States Gypsum Company, 270 F.2d 857, 858-860 (4th Cir. 1959).

The court holds here that the evidence developed at the hearing, and the pleadings, present a question of law to be decided by the court, and there is no

issue of fact for a jury, even assuming that either party as a matter of right is entitled to have a jury decide disputed questions of fact under a plea such as this.

The facts can be summarized as follows. The plaintiff's decedent (Loftis) was killed as the result of an accident which occurred on July 2, 1971, on the premises of the defendant's plant in West Point, Virginia. While walking from one point to another outside of a building near the job site in question, he was struck and killed by a fork lift truck alleged to have been negligently operated by an agent and employee of the defendant. At the time, the plaintiff, a steamfitter or pipefitter (T. 119) by trade, was working as a "pipefitter foreman" for B & G Olsen Division of Natkin Company (B & G). B & G is predominently a mechanical contractor but does general contracting work also (T. 104). The letterhead of its stationery included as a part of an exhibit shows "Mechanical Contractors - Industrial Piping - Power Plants - Air Conditioning - Plumbing - Heating."

The defendant had a contract with B & G (defendant's exhibit 2) whereby B & G was to "furnish all necessary labor, supervision, tools, materials, equipment and subcontracts to perform any mechanical work at your West Point Plant as directed by authorized Chesapeake Corporation representatives." (letter of 10/13/69) The contract was to "[f]urnish labor and supervision to perform jobs as assigned by [the defendant's] Maintenance Department. . . ." (memo of 11/25/64).

The defendant is a manufacturer of pulp and paper, and within its administrative organization there is a Maintenance Department (D-1). In that department the defendant employs persons with skills ranging from that of a master mechanic, on the one hand, to laborers on the other. In the regular employ of the defendant are pipefitters and those who do "similar type" work which Loftis was doing on the day of the accident (T. 37). Generally, the defendant's employees do the same type of work as B & G s employees

do for the defendant. This work involves maintenance of all kind of the defendant's equipment.

B & G obtains most of its employees through the business agents of local Building Trade Unions in the Richmond area. In this way, B & G acquires the necessary mechanics or foremen to meet its business commitments. Loftis became employed on this occasion in that manner and commenced work on June 22, 1971, at the defendant's plant. He worked there each weekday from that date to the day of the accident on July 2.

At the time of the accident, pursuant to a work order from the defendant's Maintenance Department, Loftis was making preparations to put a fiberglass top on a seal pit. This was described (T. 57-58) as a concrete box with a steel top and steel pipes which has salt water in it. The defendant wanted to replace the steel top and pipes with fiberglass. He was supervising two or three men (none of which were the defendant's employees) in getting ready to remove the pipe and he was also "making preparations and fabricating pipe to go onto the new top. . ." (T. 99) It was near the location of this job that the accident occurred. The forklift truck was driven by an employee of the defendant who was performing work for the defendant unrelated to the job Loftis was working on. (T. 126) Loftis when struck was walking to a point on the defendant's premises where he could discuss with another B & G employee a detail concerning the job aforesaid.

The contract with B & G enabled the defendant to supplement its own maintenance work force during "peak periods," that is, when the defendant has more work to do than could be done by the defendant's regular employees. Rather than hiring a "bunch of people" during peak periods as regular employees and then "letting them go," the defendant endeavors to keep a "good level number of people" in their regular employ, and then bring in employees of an independent contractor during these peak periods.

The nature of work done under this contract was, as stated, maintenance work as distinguished from "plant improvement projects," for which B & G is also used, but is supervised by the defendant's Engineering Department. B & G's men are in the defendant's plant almost all of the time with the daily average number over the period of a year being about 25 to 30 men (T. 24, 117). About 175 of the defendant's regular employees do the same type of maintenance work, and supervision thereof, as do the employees of B & G at the defendant's plant. B & G employees in this area are from similar trades as the defendant's employees who are engaged in this maintenance work (T. 30).

The defendant has four major "shutdown periods" during the year, July, Christmas, Spring and Fall. A shutdown period is defined as a time when either the whole plant ceases operation or portions of it stop producing. These planned shutdown periods (there are other times when the plant or a portion thereof may be shut down without advance planning) enable maintenance work to be accomplished within and on the equipment. The July 4th weekend and the Christmas holiday are "union no-work holidays," that is, the defendant's union employees are prohibited from working by the union contract. The defendant's union employees could not work on July 4 and 5. The July shutdown period extends from four to eight days after July 5 (T. 31). Prior to July 3, the defendant is doing its "routine regular maintenance work, in preparation for this shutdown." (T. 32)

It is during these shutdown periods that the number of B & G employees on the defendant's premises is increased since more of the maintenance work is scheduled during that time, particularly on machines that cannot be worked on while they are running. Furthermore, B & G's people work on the "union no-work holidays."

The defendant performs its "shutdown" work with its own employees and what it cannot do with its own manpower, it accomplishes through the employees of independent contractors such as B & G. About 75 per

cent of the July shutdown work is done by the defendant s employees while 25 per cent is performed by the B & G employees. There is no work done by B & G during the no-work holidays which exceeds the capabilities and skills of the defendant's own maintenance employees.

During the July shutdown, the number of B & G employees working at the defendant's plant increased from 25 to 30 to 40 or 50 people two or three days before the no-work holiday of July 4-5. During the 2-day holiday, about 130 B & G employees worked there and the number deceased during the remainder of the shutdown period because the defendant's employees had returned to work.

The contract documents (D-2) show that workmen's compensation insurance coverage was in force at the time of this accident with Loftis's employer as the named insured.

It is against this factual background that the issue of the employment status of Loftis, and the legal effect thereof on this common law action, is to be considered. If the defendant is an "other party" within the meaning of Code §§ 65.1-40, 65.1-41, and 65.1-103, the defendant's plea must be overruled. The undisputed facts dictate a contrary conclusion as a matter of law.

Loftis's employer was a mechanical contractor which performed mechanical work and he was engaged in such work at the time of the accident. The defendant, a manufacturer of pulp and paper products, engaged in mechanical maintenance work on its own equipment in aid of its own manufacturing operations. The cases have stated the test in several ways, but in any way the test is stated, the defendant in this case cannot be classed as "a stranger to the employment and the work." Feitig v. Chalkley, 185 Va. 96, 104 (1946). The defendant is not an "other party" since at the time of the accident the plaintiff was performing work that was a part of the defendant's trade, business and occupation. Burroughs v. Walmont, 210 Va. 98, 99 (1969). This "indispensable activity is, in [the

defendant's] business, normally carried on through employees [of the defendant] rather than through independent contractors." Shell Oil Co. v. Leftwich, 212 Va. 715, 722 (1972).

The plaintiff argues that at the time of the accident Loftis was engaged in a "specialized form of activity" in that the work during the no-work union holiday period of July 4-5 could only be performed by B & G's employees and since Loftis was making preparations to actually do the assigned job on July 4-5 pursuant to the work order (P-1) then his work at the time was not such as was "normally" carried on by the defendant's employees. This argument attempts to require the classification of the activity, or the nature of the work done, according to the time it is to be performed. The law does not support this view. Under the decided cases, the inquiry is directed to the "kind of work which employees of the owner usually or approximately do, though, in the particular instance, some or all of the work was being accomplished through independent contractors." (Emphasis added) 270 F.2d at 863. Under these facts, the time of performance does not create a "specialized activity," as the plaintiff argues.

The defendant regularly and customarily did the maintenance work of the type involved here for itself. Therefore, it became a part of the defendant's trade, business, and occupation within the meaning of Code § 65.1-29, and the exclusive jurisdiction over this claim resulting from its employee's negligence lies in the Industrial Commission of Virginia. To the same effect, see also Floyd Adm'x. v. Mitchell, 203 Va. 269 (1962); Williams v. Gresham Company, 201 Va. 457 (1959); Anderson v. Thorington Construction Company, 201 Va. 266 (1959); Doane, et al. v. E. I. duPont deNemours & Company, 209 F.2d 921 (4th Cir. 1954).

For these reasons, the plea of the defendant is sustained.