Timothy Wayne **PERRY**, Plaintiff,

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 2:94cv333.

United States District Court,
E.D. Virginia,
Norfolk Division.

April 12, 1995.

Michael F. Imprevento, Andrew M. Sacks, and Stanley E. Sacks, Sacks, Sacks & Imprevento, Norfolk, VA, for plaintiff.

Susan L. Watt and Lawrence R. Leonard, U.S. Attorney's Office, Norfolk, VA, for defendant.

### ORDER

CLARKE, District Judge.

## RELEVANT FACTS

On May 1, 1991 the Plaintiff, Timothy Wayne Perry ("Perry" or the "Plaintiff") was seriously burned while performing certain work on an A–6E aircraft that was owned, operated and maintained by the United States Department of the Navy. Although an employee of the Boeing Corporation ("Boeing"), Perry was working at the Naval Air Station, Oceana, which is located in Virginia Beach, Virginia.

Previously, Boeing had contracted with the United States to replace the aluminum wings on A–6E aircraft with wings made from a composite material. The new composite wings were installed before Boeing's testing of the wings was complete, however.[1] During the testing, and while some composite wing A–6E aircraft were already in use by the United States, Boeing determined that the A–6E's new wings would fail prior to the expected service life of the aircraft. Accordingly, Boeing was obligated to remedy this defect.[2]

The remedial work, which Perry was conducting on an in-service A–6E aircraft when he was injured, was pursuant to Engineering Change Proposal 510–5058 ("ECP–5058"), a document produced by Boeing and detailing the necessary modifications. Under ECP–5058, Perry was required to replace a series of nut and bolt assemblies in the forward wing to body fitting. In essence, Perry's task required that he remove the existing nut and bolt assemblies and replace them with the stronger after production nut and bolt assemblies. However, there were two complications: first, the nuts were difficult to reach[3] because they were located inside one of the aircraft's fuel cells; second, the nuts were covered with a chemical sealant which had to be scraped off before a wrench could be used to loosen the nut.[4]

On April 30, 1991 Perry was detailed by Boeing to perform an ECP–5058 on an A–6E at Oceana. However, after opening the fuel cell door, Perry discovered that the aircraft had not been drained of fuel. Perry informed his supervisor, Jim Clapham, who in turn alerted Navy personnel. The next day, May 1, 1991, Perry resumed work on the A–6E. The aircraft had been defueled and pencil drained.[5] Perry opened the fuel cell door and, upon noticing some remaining puddles of fuel, wiped the interior of the fuel cell with a cheesecloth. Perry then began to perform the ECP. In order to remove the sealant, Perry used, among other things, a

1. The fatigue testing of the wings required approximately forty-two months to complete.

2. The A–6E was simultaneously in testing, production and use. Accordingly, the engineering changes were incorporated into aircraft both at the Boeing production facility and aircraft already in operation. ECP–5058 was performed without a change in the contract price.

3. Indeed, Perry could only see the assemblies by using a mirror and flashlight. Thus the job required a good deal of manual dexterity; while standing on a step ladder, Perry had to reach over his head, insert his arm into the open fuel cell, and feel blindly for the nut. Perry would then have to remove the sealant from the nut, use his wrench to loosen it, and then replace the assembly. This process would have to be repeated for each set of the eight nuts and bolts.

4. It was not contemplated in the original wing design that these assemblies would ever be replaced or removed. Thus ECP–5058 could not be considered routine maintenance.

5. An aircraft is pencil drained by opening certain valves on the underside of the fuel cell and then allowing the fuel to gravity drain into a receptacle. Typically, small amounts of fuel "puddles" will remain in the cell after pencil draining.

Dotco brand pneumatic wire brush.[6] Perry had used the Dotco brush in the same manner on five or six previous occasions. This time, however, as he worked, an explosion occurred and Perry sustained serious bodily injury. The Court finds that the explosion was caused by a spark which resulted from the use of the Dotco wire brush against a metal surface in the fuel cell igniting residual jet fuel vapor.

## PROCEDURAL HISTORY

On March 30, 1994, Perry filed suit against the United States pursuant to the Federal Torts Claims Act, 28 U.S.C.A. § 1346(b) (West 1993). On August 19, 1994 the Court heard the Defendant's Motion to Dismiss. By Order dated August 19, 1994, the Court withheld ruling on the motion and granted Plaintiff leave to amend his Complaint. After the Plaintiff amended his Complaint, the United States filed a combined Motion to Dismiss/Motion for Summary Judgment. By Order dated January 20, 1995, the Court ruled that all dispositive motions should await a full presentation of the evidence. A bench trial was conducted from April 3, 1995 through April 5, 1995 and the matter is now set for disposition.

## ANALYSIS

■ Under the Federal Tort Claims Act, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances. . . ." 28 U.S.C.A. § 2674 (West 1994). Accordingly, when subject to a state law tort suit, the United States is entitled to the same defenses as would be available to any private party. *See Hyman v. United States,* 796 F.Supp. 905, 906 (E.D.Va.1992).

In Virginia, the Workers' Compensation Act, Va.Code Ann. § 65.2–307 (Michie 1991), is an employee's exclusive remedy against his employer for injuries sustained on the job.

That is, an employer is generally immune from an employee's tort suit. Furthermore, in some circumstances, employer status is attributed as a matter of law to certain third-parties known as "Owners." *See* Va.Code Ann. § 65.2–302 (Michie 1991). Thus, Owners who achieve statutory employer status are entitled to the same immunity as would be found in a customary employee/employer relationship.

■ Here, the United States claims that it was Plaintiff Perry's statutory employer under Virginia law. Statutory employer status is attributed to an Owner when the injured employee performs work that is part of the Owner's "trade, business or occupation." *Id.* As applied to a governmental entity[7] such as the United States Navy, the appropriate test is what activities the putative statutory employer is "mandated to do by statute or regulation." *Pendley v. United States,* 856 F.2d 699, 702 (4th Cir.1988), *cert. denied,* 490 U.S. 1005, 109 S.Ct. 1640, 104 L.Ed.2d 155 (1989). In other words, any activity which a government entity is authorized or required to do is considered its trade, business or occupation. *Hyman,* 796 F.Supp. at 907 (*citing Nichols v. VVKR, Inc.,* 241 Va. 516, 403 S.E.2d 698, 701 (1991)).

■ Given these principles, it is incumbent upon the Court first to characterize the activity Perry was engaged in, and then to inquire whether that activity was one which the United States Navy was authorized or required to perform. Perry contends that performing ECP–5058 constituted "on-site production" work which was neither authorized nor required. Even assuming *arguendo* that Perry was performing "on-site production work" (as opposed to maintenance, construction, etc.), the Court nevertheless disagrees with his conclusion.

In other words, because a private entity is self-defined, its trade, business or occupation can be ascertained by considering what the entity actually does. Conversely, because government entities are subject to statute and regulation, they are defined not only by what they do in fact, but also by what they are authorized or required to do by rule. *See Hyman,* 796 F.Supp. at 907.

---

**6.** Perry could have removed the sealant using only a hand-tool such as a putty knife; however, the Dotco pneumatic tool was more effective.

**7.** Private entities are held to a different standard. Under *Shell Oil Co. v. Leftwich,* 212 Va. 715, 187 S.E.2d 162, 167 (1972), statutory employer status will be attributed to an Owner when the activity in question is "normally carried on through employees rather than independent contractors."

**540**

Title 10 § 5013 of the United States Code Annotated provides, *inter alia*, that the Secretary of the Navy has the power to act in the following areas: organizing, supplying, equipping (including research and development), servicing, maintaining, and "the construction, outfitting and repair of military equipment." 10 U.S.C.A. § 5013 (West Supp.1995). Furthermore, § 5062 provides that "[t]he Navy shall develop aircraft, weapons, tactics, technique, organization, and equipment of naval combat and service elements." 10 U.S.C.A. § 5062 (West Supp. 1995). The Court finds that ECP–5058 was encompassed by the United States Navy's mandate under § 5013 and § 5062.

Perry counters, however, that the statutes cited above are ambiguous, ill-defined and vague; he therefore concludes that "the specific act of aircraft production" is not within their ambit. However, as the Defendant notes, there is no requirement that the statutory authority relied upon to confer immunity precisely describe the activity which caused the injury. Sections 5013 and 5062 are sufficiently specific.[8]

Moreover, the case law bears out this conclusion. In *Hyman,* a decision this Court finds particularly instructive, Mr. Hyman, the plaintiff, was injured in a car accident while inside the Norfolk Naval Base. 796 F.Supp. at 908. Hyman was on the base to perform "post delivery warranty work" on the *Wasp,* an active duty navy vessel.[9] At the time of the accident, the plaintiff was moving his personal automobile to a parking lot and collided with a Navy van. *Id.*

In finding the Navy immune, the Court observed that when determining statutory employer status, the focus is on the "overall function" of the governmental entity. *Id.* Thus federal statutes which obligated the Navy to keep its fleet in good repair were sufficient to preclude suit for an accident which did not occur specifically during the course of the contracted for work. That is, Hyman was injured while moving his car not while actually performing the required work. *Hyman,* therefore, supports the Court's conclusion and dispatches with Perry's argument that a higher degree of specificity is required. Here, it is evident that § 5013 and § 5062 authorize the Navy to not only render everyday repair and maintenance on its equipment, but also authorize the Navy to perform non-typical work such as ECP–5058.

## CONCLUSION

For the reasons stated above, the Court finds that Plaintiff Perry was the United States Navy's statutory employee when he was injured on May 1, 1991. Accordingly, Perry is precluded as a matter of law from bringing this action. Perry's suit is therefore DISMISSED with prejudice.

**IT IS SO ORDERED.**

---

8. Indeed, the Workers' Compensation Act, because it is a remedial statute, should be liberally construed to effect its purpose: providing compensation to an injured worker. *Pendley,* 856 F.2d at 702.

9. Plaintiff Hyman was an employee of a subcontractor.