# Richmond

SHELL OIL COMPANY v. JEFFREY STEPHEN LEFTWICH.

SHELL OIL COMPANY v. LINDA SUSAN GARNETT, ET AL.

March 6, 1972.

Record Nos. 7679 and 7680.

Present, Snead, C.J., Carrico, Gordon, Harrison, Cochran and Harman, JJ.

*Francis V. Lowden, Jr. (James A. Harper, Jr.; Paul M. Thompson; Hunton, Williams, Gay, Powell & Gibson,* on brief), for appellant in Record Nos. 7679 and 7680.

*James A. Eichner (James M. Minor, Jr.; Henry H. McVey, III; Allen, Allen, Allen & Allen; Minor, Thompson, Savage, Smithers & Benedetti; McGuire Woods & Battle,* on brief), for appellee in Record No. 7679.

*Henry H. McVey, III (James A. Eichner; James M. Minor, Jr.; McGuire, Woods & Battle; Allen, Allen, Allen & Allen; Minor, Thompson, Savage, Smithers & Benedetti,* on brief), for appellees in Record No. 7680.

HARRISON, J., delivered the opinion of the court.

Shell Oil Company appeals the entry of awards by the Industrial Commission of Virginia following its decisions that Jeffrey Stephen Leftwich and Wayne Eugene Garnett were the statutory employees

of Shell, and that an accident which occurred on January 6, 1969, in which Leftwich was injured and Garnett was killed, arose out of and in the course of such employment.

Shell Oil Company was the owner of a service station leased to Vilas G. Robinson trading as Providence Forge Shell Station. Garnett and Leftwich were employed by Robinson. On January 6, 1969 the two employees were on a service call away from the premises of the service station in Providence Forge. They were driving a wrecker truck owned by Robinson. While on this call the employees were struck by a Chesapeake and Ohio Railway train. Garnett was killed and Leftwich was seriously injured.

The facts surrounding the lease agreement between Shell and Robinson were stated in the opinions of the Commission to be as follows:

> "In September 1964 Shell and Robinson entered into several written agreements. Shell leased to Robinson land and improvements on Route 60 in Providence Forge, Virginia. By the lease the premises were to be used 'only for the operation of (an) automobile service station thereon, including the retail sale of petroleum products, accessories and minor repair and other services for motor vehicles,' and the station was to be kept open 'for the sale of such products' by Robinson for a specified number of hours each day, except 'those days prohibited by law.' The rent was based upon the volume of gasoline sales.

> "By a 'Dealer Sales Agreement,' Shell contracted with Robinson (Dealer) to sell and deliver to him, and Robinson agreed to purchase and receive from Shell, such quantities of Shell gasolines and Shell automotive lubricants as Robinson should order from time to time during the continuance of the contract, for resale at Robinson's service station. The agreement provided that either party could terminate the contract at any time by giving the other at least ten days' notice. The contract was nonassignable without the prior written consent of Shell.

> "Shell sold to Robinson for $1.00 an illuminated sign displaying the letters, 'Shell,' which sign Shell agreed to install and maintain on the premises.

> "Shell leased to Robinson a credit card imprinter to be used by Robinson at the service station only with credit card holders of Shell or such others as Shell authorized in writing.

"Shell granted to Robinson a license to use a program promoting such car maintenance services as Robinson and his employees were qualified to perform; however, there was no qualification certification, and the program 'never got off the ground' and was phased out.

"Shell offered, and Robinson accepted, a procedure termed a 'Meter Reading Price Assistance Plan.' The procedure allowed Shell to provide a 'competitive price allowance' during periods of 'dealer price subnormality.' In common terminology, the procedure allowed Shell to be competitive during so-called gasoline price wars; however, Robinson remained free to establish his own retail price for gasoline.

"Shell has had various games to promote the sale of its products, but Robinson had the choice of participating or not. Robinson elected to participate in some of the games but not all.

"Prior to December 12, 1968 Robinson bought gasoline from Shell pursuant to a consignment-remittance system. After that date Robinson began paying Shell by cash, check, credit cards, or a combination thereof, for the gasoline at the time of delivery to the service station by Shell. Shell, however, retained a security interest in the product.

"It is not contended that Robinson was an employee of Shell, as the common law relationship of master and servant did not exist between him and Shell. We find that Robinson was an independent contractor, not an employee of Shell.

"Robinson was free to hire and fire his employees, to set their pay and hours of work. He withheld taxes and Social Security, and he controlled the manner and means by which his employees performed their work.

"At the service station Robinson sold gasoline, oil, batteries, tires, accessories, and other specialties, and did minor tuneups and road service calls. The station had two bays, a sales room, and four gasoline pumps.

"Robinson sold some products, other than gasoline, not Shell's. Robinson set the prices he charged for products and services, but it was his testimony that Shell had a suggested list price which he followed.

"The wrecker, in which Leftwich [and Garnett] were riding when [Leftwich] was injured [and Garnett was killed], had the

Shell emblem and 'Providence Forge Shell' on the door. The wrecker also displayed the sign, 'Allstate Road Service.'

"Shell encouraged the use of a vehicle to answer such service calls as Leftwich [and Garnett] were on at the time [Leftwich was injured and Garnett was killed], and the use of a Shell credit card was acceptable payment for service calls.

"Shell, a Delaware corporation, has about 25,000 gas stations throughout the United States. About 13,000 of these are leased from Shell, as Robinson leased from Shell. The others are jobber stations. In that situation a jobber, who owns his own equipment and tanker trucks, buys gasoline from Shell's bulk plants, transports it in his tanker trucks to his own storage plant, and then takes it out and sells it to his jobber dealers.

"In Shell's Richmond District, which comprises Virginia less the metropolitan District of Columbia area, there are 130 to 140 leased stations such as Robinson's.

"Shell selects the sites for its leased stations and designs the station's layout. Shell operates a training school in the Richmond area in which it trains new dealers in the operation of a service station. Since Shell is the landlord of a leased station and has certain maintenance responsibilities, it designates certain contractors, called 'blanket order contractors,' whom a dealer can call when maintenance is needed."

The evidence further shows that Shell employs dealer salesmen whose responsibility is to seek out prospective dealers, install them in the stations, counsel with them, collect the rent when due, and generally promote the image of Shell in a given territory.

Gordon C. Goodyear, Jr., sales supervisor for the Richmond district of Shell, described the business that Shell normally operates with its own employees. He said that its geologists located likely places where there might be oil and the company drilled for it; that if oil were found the company's production crews pumped the crude oil out of the ground and it was then moved by tanker, barge or pipeline to the refinery; that its biggest single product is gasoline which was moved from the refinery by tanker, barge or pipeline to bulk plants which are scattered around the United States; and that at its bulk plants Shell has trucks to make delivery to the dealers.

Goodyear testified that when the gasoline goes out to a station and "we drop it into the ground, the gasoline is invoiced at that point

and we pick up credit cards and a check or cash from the dealer". He testified that Shell does not operate service stations, it does not repair automobiles and it is not in the business of giving road service.

Prior to 1967 it was testified that Shell, on one occasion when left with a vacant station, had conducted a temporary interim operation with its own employees. This practice was discontinued in 1967 and thereafter when Shell was left with a vacant station it would either close the station or install a new dealer. It never used one of its own employees to keep a station operating.

The issue before us is not a novel one. It has been considered by numerous state and federal courts. The decisions vary depending on the language of the statute being construed and the facts in the case under review.

The statute involved here is Code § 65.1-29 which provides:

"Liability of owner to workmen of subcontractors.—When any person (in this section and §§ 65.1-31 and 65.1-32 referred to as 'owner') undertakes to perform or execute any work which is a part of his trade, business or occupation and contracts with any other person (in this section and §§ 65.1-31 to 65.1-34 referred to as 'subcontractor') for the execution or performance by or under such subcontractor of the whole or any part of the work undertaken by such owner, the owner shall be liable to pay to any workman employed in the work any compensation under this Act which he would have been liable to pay if the workman had been immediately employed by him."

The position of Shell is that the long standing rule in Virginia is that the owner becomes liable for workmen's compensation to statutory employees only if by contract he has work performed which work he, the owner, would normally do with his own employees. Shell cites *Bamber* v. *City of Norfolk*, 138 Va. 26, 121 S. E. 564 (1924), *Perkinson* v. *Thomas*, 158 Va. 699, 164 S. E. 561 (1932), *Sears, Roebuck & Co.* v. *Wallace*, 172 F. 2d 802 (4th Cir. 1949) and numerous other decisions, some from jurisdictions having statutes very similar to Code § 65.1-29.

Shell relies strongly on the case of *Barnhart* v. *American Oil Co.*, 237 F. Supp. 492 (E. D. Va. 1965), *aff'd.* 354 F. 2d 659 (4th Cir. 1966). There the plaintiff was employed by Hornsby's Sons, Inc. as a tank truck driver. He was injured when he fell from a truck while loading fuel oil at the refinery of the American Oil Company.

Hornsby was a jobber engaged in distributing American's gas and related products and was operating a chain of service stations in the Peninsula area of Virginia. He owned some stations and leased others from American. These stations handled and sold American products to the consumer public. Barnhart sued American Oil Company at common law for damages. American defended, alleging that Barnhart was a statutory employee of American and therefore could not sue at common law as his sole remedy was under the Workmen's Compensation Law of Virginia. Judge Hoffman, applying Virginia law, held that American could not be required to pay workmen's compensation to Barnhart, and that the latter could maintain his action against American at common law for damages. In reaching this conclusion the court held:

> "Undeniably American is engaged in the business of producing and marketing gasoline and petroleum products and, while its ultimate objective is to place its products in the hands of the consumer public, this is true as to every manufacturer of a product, whatever the nature of the same may be. It does not follow that the salesman handling a manufactured product which reaches the consumer public through a retail store is the statutory employee of the manufacturer who, of necessity, is vitally interested in the various methods of distribution. We need not concern ourselves with American's salaried employees located at Richmond and Norfolk and the fact that salaried loaders fill their American owned trucks at Yorktown for transmittal to the bulk plants at these locations. Nor are we involved with commission jobbers handling American products on a commission basis in certain assigned areas. We are not impressed by the fact that American, as is true with all large fuel oil companies such as Humble (Esso), Gulf, Shell, Texaco, Phillips, Socony and others, issue credit cards which places the ultimate responsibility of collection of individual accounts upon the parent company.

> \* \* \*

> "In the final analysis we think that the passing of title or ownership of the fuel oil from American to Hornsby is the most important single factor in determining whether Barnhart was a 'stranger' to American's business, trade or occupation. . . .

> "Perhaps it can be said that no authority precisely in point has been directed to the Court's attention. The reason is probably

that no such an extension of the 'statutory employer' doctrine has ever heretofore been urged. We prefer to follow the rule enunciated in *Perkinson* v. *Thomas,* 158 Va. 699, 164 S. E. 561, wherein an award of compensation benefits was reversed when the injured employee of a seller of logs was held not entitled to compensation from a processor of logs since the relationship of the employer to the processor was simply that of buyer and seller of a commodity, the court stating:

> 'The relevant portion of the act refers to an owner who undertakes to perform *any work* which is a part of his trade or business and procures another to perform the whole or any part of *that work* which the owner had undertaken.' " 237 F. Supp. at 496, 497.

Appellees say, as did a majority of the Commission, that the pivotal question is whether the independent contractor, Robinson, was performing work that was a part of the trade, business or occupation of Shell on January 6, 1969. They say that the test is not whether the owner, by engaging an independent contractor to perform some part of his business, thereby engages in the business of the independent contractor. It is whether such contractor is performing work that is part of the trade, business or occupation of the owner. It cites in support *Sykes* v. *Stone and Webster Engr. Corp.,* 186 Va. 116, 41 S. E. 2d 469 (1947); *Floyd, Administratrix* v. *Mitchell,* 203 Va. 269, 123 S. E. 2d 369 (1962); *Anderson* v. *Construction Company,* 201 Va. 266, 110 S. E. 2d 396 (1959), and other cases.

Appellees' position finds support in *Continental Oil Co.* v. *Sirhall,* 122 Colo. 332, 222 P. 2d 612 (1950) which was decided under a statute which makes a statutory employer any company which engages in any business "by leasing, or contracting out any part of or all of the work thereof to any lessee, sublessee, contractor or subcontractor. . . ." The Colorado court held:

> "The fact that Continental Oil Company was the lessor of claimant's employer would not of itself create liability on its part. . . . 'To make the lessor so liable there must be facts showing that he is operating, engaged in, or conducting his business by leasing; not merely that he is a lessor.'
>
> \*    \*    \*
>
> "We have, then, a situation where a company, engaged in the

refining and sale of gasoline and oils, owns many parcels of real property; that they are equipped with buildings, pumps and other facilities adapted only for sale of such products as it manufactures and distributes; that these properties are all of similar appearance and all bear conspicuously the company's peculiar trade-name and sign; that they are leased for terms of one year only; that while the tenants are theoretically free to sell the products of competing companies, in fact none has ever done so; but all are engaged in and the leased property devoted to, the sale of the company's products; and that any other sales made or services performed at these properties are merely incidental to the sale of the company's products." 122 Colo. at 334-35, 222 P. 2d at 613.

In *Industrial Commission* v. *Vancil*, 133 Colo. 238, 242, 293 P. 2d 641, 643 (1956), *Sirhall* was construed as imposing liability "only in those cases where it has been clearly shown the company or person charged has actually been conducting its own business through some system of leasing or contracting".

Professor Arthur Larson, in his work, *The Law of Workmen's Compensation*, Vol. 1A, states:

"[T]he test is not one of whether the subcontractor's activity is useful, necessary, or even absolutely indispensable to the statutory employer's business, since, after all, this could be said of practically any repair, construction or transportation service. The test (except in cases where the work is obviously a subcontracted fraction of a main contract) is whether this indispensable activity is, in that business, *normally* carried on through employees rather than independent contractors." (Emphasis supplied.) Larson at § 49.12, pp. 872, 873.

The test enunciated by Larson is one we have followed in previous decisions, the most recent being *Burroughs* v. *Walmont*, 210 Va. 98, 168 S. E. 2d 107 (1969) and *Hipp* v. *Sadler Materials Corp.*, 211 Va. 710, 180 S. E. 2d 501 (1971).

We must therefore determine whether the retailing of gasoline to the general public, admittedly an indispensable activity to the Shell Oil Company, is an activity normally carried on by Shell through its employees rather than through independent contractors.

From the evidence before us we conclude that Shell does not retail

gasoline, i.e., sell to the consumer public. Sale to the consumer is, of course, the ultimate, indispensable and final step in the petroleum business. However, an oil company must engage in numerous preliminary steps or acts prior to the ultimate sale. Admittedly Shell explores for oil, digs wells, refines crude oil, transports gasoline to bulk plants and distribution points, and distributes this gasoline to its dealers and jobbers. But it does not sell to the consumer. It sells to the dealers and jobbers.

In the instant case Shell's control over the gasoline terminated upon its delivery to the dealer. At that point the dealer, Robinson in this case, took possession and control. He could give the gas away, sell it for cash or on credit, or to a man who held a Shell credit card. While he sold gas at the retail price suggested by Shell that was not obligatory.

Shell recorded a number of financing statements and security agreements, to secure debts due Shell by Robinson. This did not operate to change the relationship between the parties.

Robinson, having leased the service station from Shell, was in complete possession and control thereof. He hired and fired employees at will and otherwise conducted the business of a service station operator and garageman. He was an independent contractor. The Commission so found, and its finding is supported by the evidence. Manifestly Shell, as Robinson's landlord, and as a seller of gasoline to him, was concerned with the manner in which the station was conducted and with the success of the venture. It was desirous of maintaining a satisfactory relationship with Robinson. Having determined to market its gasoline through independent dealers throughout the United States, Shell had a stake in the type of dealers that rented its stations and purchased its product and in the attractiveness of the stations they operated. The good will and benefit which Shell envisioned from its marketing policy of having local, independent dealers retail Shell products could well be dissipated by unattractive stations or inefficient operations. Hence Shell had its representatives inspect the stations it leased to dealers, and advise with the dealers from time to time. This conduct did not alter the status of a dealer as an independent contractor or make Shell a retailer of gasoline.

As a basis for its decisions and awards the Commisson held that Robinson was performing work that was a part of the trade, business or occupation of Shell, and that Leftwich and Garnett were entitled to the benefits of the Workmen's Compensation Act from Shell. We

find ourselves in disagreement with the test applied by the Commission.

Our conclusion is that while the sale of gasoline was indispensable to Shell's business, such sale to the consumer public was an activity which Shell did not normally carry on through its employees—and that this determines its liability under Code § 65.1-29.

Shell Oil Company was engaged in exploring, drilling and processing petroleum products and then wholesaling such products to retail dealers. It did not operate retail service stations or provide automotive services through its own employees. Such was done by independent contractors like Robinson.

Shell was not a statutory employer of Leftwich and Garnett. The accident which resulted in injury to one and the death of the other did not arise out of and in the course of their performing Shell's work.

Accordingly, the awards of the Commission appealed from are reversed and the respective applications of the appellees are dismissed.

*Reversed and dismissed.*