# RALEY H. HENDERSON

## V.

# CENTRAL TELEPHONE COMPANY OF VIRGINIA

Record No. 840204

April 24, 1987

Present: Carrico, C.J., Cochran,* Poff, Compton, Stephenson, Russell, and Thomas, JJ.

---

\* Justice Cochran participated in the hearing and decision of this case prior to the effective date of his retirement on April 20, 1987.

*Charles F. Midkiff (Louis R. Monacell; Edwin B. Baker; Tyler E. Williams, III; Christian, Barton, Epps, Brent & Chappell; Baker & Williams*, on briefs), for appellant.
*William A. Perkins, Jr. (McGuire, Woods & Battle*, on brief), for appellee.

THOMAS, J., delivered the opinion of the Court.

Raley H. Henderson, an employee of Continental Communications Construction Company (Continental), was injured on March 31, 1980, when he fell from a rolling ladder while supervising the addition of trunk lines to the No. 5 Crossbar[1] located in the Charlottesville office of Central Telephone Company of Virginia (Centel). On October 11, 1979, Centel entered into a contract with Continental for the "installation and/or maintenance of Central Office Equipment." At the time he was injured, Henderson, was acting pursuant to the contract.

In January 1982, Henderson sued Centel and others. On March 1, 1982, Centel filed a Special Plea challenging the trial court's jurisdiction. Centel contended therein that it was Henderson's statutory employer and that Henderson's exclusive remedy was under the Workers' Compensation Act (the "Act"). Centel asked that it be dismissed from the suit. The matter was heard on November 10, 1982. On December 3, 1982, the trial court rejected the Special Plea, concluding, in effect, that Centel was not Henderson's statutory employer. Centel filed a motion for reconsideration. Upon reconsideration, the trial court changed its initial deci-

---

[1] A No. 5 Crossbar is a type of telephone switching equipment.

sion, granted the Special Plea, and dismissed Centel as a defendant. Henderson appealed.

The sole issue in this appeal is whether, at the time of his injury, Henderson was engaged in work that was part of Centel's trade, business, or occupation. If so, Centel was Henderson's statutory employer and the trial court was correct in dismissing Centel from the suit. In our opinion, the trial court correctly decided this issue; therefore, we will affirm its judgment.

The pertinent facts are as follows: Centel is a public utility regulated by the laws of the Commonwealth and subject to the administrative control of the State Corporation Commission (Commission). Centel is required by statute to provide "adequate service and facilities." Code § 56-234. Moreover, pursuant to Code § 56-35, the Commission issued a document entitled "Operating Service Criteria For Virginia Telephone Utilities." That document contains the following requirement: "Each telephone company shall provide the necessary equipment and plant facilities within its certificated areas to handle the local and toll traffic so that" certain conditions of service will be met.

Centel supplied all the materials for the job on which Henderson was working. Continental supplied the labor. None of Centel's employees worked with Continental's employees on the installation. Nor did Centel supervise Continental's work. However, the Continental workers were subject to Centel's control regarding working hours, access to the facility, and preventing interruptions of existing service. In addition, Centel received progress reports on Henderson's work. Centel also inspected Continental's work and noted instances where the specifications were not met. Centel considered compliance with the specifications to be its responsibility. Centel admitted that the work Continental was doing was not a subcontracted portion of a larger contract. On the date he was injured, Henderson was "working as a telephone equipment installer."

Centel was capable of installing the equipment that Continental was installing but chose not to do so for economic reasons related to the "peaks and valleys" in demand for central office equipment installation and to certain terms in its union contract that made it more costly for it to use its own employees to do central office installation work. Centel employees have, in the past, installed central office equipment of greater complexity than that Henderson was installing. According to Centel, even without using con-

tract labor, it could have met its statutory duty to provide adequate service and facilities. To do so, however, Centel would have had to increase its own labor force with a likely increase in its costs and the costs to its customers. When asked whether Centel employees installed central office equipment, one witness testified that Centel employees had, in the past, installed various types of central office equipment including the following:

> subscriber carrier, VF repeaters, pads and transformer units, various and different kinds of signaling equipment and SFDX equipment, program amplifiers for radio stations, traffic measuring equipment, automatic transfer equipment for carrier, main frame protections, the carriers themselves, trunks, recorder announcers, touch call equipment, power saving carrier, to name just a few.

The same witness said that at the time Henderson was making his installation, Centel had six employees who "were capable of doing any of the work that Mr. Henderson was employed doing."

In 1979, 50.3% of all central office installation and removal work was done with Centel labor. However, in that same year, only 3.3% of Centel labor was spent on central office equipment construction and only .0016% on work on the No. 5 Crossbar. The balance of the overall central office labor in 1979, 49.7%, was supplied by contract labor. Historically, 60% to 75% of Centel's installation requirements were met with company employees. In 1979, 72.7% of Centel's total labor requirements were met with company labor. In 1980, the figure was 75.2%.

The record discloses that the physical plant[2] necessary to provide telephone service is divided into three parts: central office equipment, outside plant, and station apparatus. All three facets of the system must work together to provide telephone service to customers. No one component by itself can provide telephone service.

According to Centel, station apparatus are installed by installer-repairmen, complex installer-repairmen, and cable splicers; outside plant network is installed by linemen and cable splicers; and central office equipment is installed by central office equip-

---

[2] The discussion of Centel's "physical plant" in this record was limited to the components of the network that were essential to providing telephone service. It did not make reference to buildings or other real estate.

ment repairmen. Centel used contract labor to work on all three facets of its physical plant. It considered outside labor as "contract augmentation" to its work force.

At least two statutory provisions bear upon the issue under consideration. Code § 65.1-5 provides as follows:

> Nothing in this Act contained shall be construed to make, for the purposes of this Act, the employees of an independent contractor the employees of the person or corporation employing or contracting with such independent contractor.

Code § 65.1-29 provides as follows:

> When any person [owner] undertakes to perform or execute any work which is a part of his trade, business or occupation and contracts with any other person [subcontractor] for the execution or performance by or under such subcontractor of the whole or any part of the work undertaken by such owner, the owner shall be liable to pay any workman employed in the work any compensation under this Act which he would have been liable to pay if the workman had been immediately employed by him.

Code § 65.1-5 provides, in essence, that the mere fact a business owner engages an independent contractor does not make that independent contractor's employees statutory employees of the owner. This means that Henderson is not necessarily Centel's statutory employee. Before the statutory employee/employer status can be established, more must be proved than that Henderson worked for Continental which in turn had a contract with Centel.

Code § 65.1-29 contemplates that an owner such as Centel can subcontract all its work yet remain liable under the Act. *See Smith* v. *Horn*, 232 Va. 302, 351 S.E.2d 14 (1986). This provision is meant to prevent an owner from escaping liability under the Act by the simple expedient of subcontracting away work which is part of its trade, business, or occupation. Such an owner will remain liable under the Act to the extent the work subcontracted is part of that owner's trade, business, or occupation.

Thus, determining Centel's trade, business, or occupation is critical. But before we can determine Centel's trade, business, or occupation, we must first settle upon the appropriate test for making that determination.

■ Developing the appropriate test and determining whether activities fall within or without an entity's trade, business, or occupation is not a simple, straightforward exercise. Deciding what is the trade, business, or occupation of an entity is a "mixed question of law and fact" and is a question that "does not readily yield to categorical or absolute standards." *Bassett Furniture* v. *McReynolds*, 216 Va. 897, 902, 224 S.E.2d 323, 326 (1976).

■ In this appeal, Henderson does not seek workers' compensation coverage from Centel. Because of this, the lawyers have referred to this as an "upside down" case. This is in contrast to the so-called "right side up" case in which the injured worker seeks workers' compensation coverage. It is significant, however, that even though Henderson does not seek coverage from Centel, our consideration of this appeal is nevertheless governed by the principles that apply in a case where coverage is sought. Those principles are as follows: The Act is highly remedial and should be liberally construed to advance its purpose. *See Fauver* v. *Bell*, 192 Va. 518, 522, 65 S.E.2d 575, 577 (1951); *Bamber* v. *City of Norfolk*, 138 Va. 26, 121 S.E. 564 (1924). Further, the fundamental purpose of the Act is to give compensation for accidental injuries resulting from the hazards of the employment. *Feitig* v. *Chalkley*, 185 Va. 96, 98, 38 S.E.2d 73, 75 (1946).

■ With the foregoing in mind, we turn to Henderson's argument. Henderson contends the test that should be used to determine whether Henderson was engaged in Centel's trade, business, or occupation is the one announced in *Shell Oil Co.* v. *Leftwich*, 212 Va. 715, 187 S.E.2d 162 (1972), and utilized in *Bassett Furniture* v. *McReynolds*, 216 Va. 897, 224 S.E.2d 323 (1976). In *Shell Oil Co.*, we wrote as follows:

[T]he test is not one of whether the subcontractor's activity is useful, necessary, or even absolutely indispensable to the statutory employer's business, since, after all, this could be said of practically any repair, construction or transportation service. The test (except in cases where the work is obviously a subcontracted fraction of a main contract) is whether this indispensable activity is, in the business, *normally* carried on through employees rather than independent contractors.

212 Va. at 722, 187 S.E.2d at 167 (citation omitted) (emphasis in original).

According to Henderson, because Centel has admitted that the work being done by Continental was not a subcontracted portion of a main contract, the exception does not apply. Further, according to Henderson, Centel's employees did not normally install the particular type of central office equipment on which Henderson was working at the time of his injury. Henderson submits the analysis is simple and the outcome clear — that he was not Centel's statutory employee. We disagree.

The *Shell Oil Co.* test has never been applied by this Court in a case involving either a public utility or a governmental entity. This is so for good reason. The test is merely an approach that is useful in determining an entity's trade, business, or occupation. It is not designed for every situation. It works best in cases involving private businesses because those entities often define their trade, business, or occupation by their conduct. With regard to such entities, what they do on a day-to-day basis provides a reasonably reliable indicator of their trade, business, or occupation.

Yet, public utilities and governmental entities are of another class. It is not simply what they do that defines their trade, business, or occupation. What they are supposed to do is also a determinant. Whereas a private business entity is essentially self-defining in terms of its trade, business, or occupation, a public utility has duties, obligations, and responsibilities imposed upon it by statute, regulation, or other means. Such is the case here.

Centel is a telephone company. It is required by law to provide adequate service and facilities. It is mandated by regulations promulgated pursuant to statute to provide "necessary equipment and plant facilities." Thus, it would be illogical to disregard what Centel is required by law to do when attempting to determine its trade, business, or occupation.

In addition, to consider only what Centel normally does with its own employees would be to ignore Code § 65.1-29, which contemplates the use of subcontractors by an owner to do all or part of the owner's work. If the *Shell Oil Co.* test is uncritically applied, the result would be that owners who subcontract out all their work would never have workers' compensation liability because *their own* employees would never *normally* do anything.

Moreover, in cases involving government entities, we have consistently considered the laws under which they were created and

under which they functioned in determining their trade, business, or occupation. We followed this approach in *Anderson* v. *Construction Company*, 201 Va. 266, 110 S.E.2d 396 (1959). The issue in that case was whether Anderson and the construction company were both engaged in the trade, business, or occupation of the Richmond-Petersburg Turnpike Authority at the time Anderson was injured. The company for which Anderson worked and the construction company which he attempted to sue both had contracts with the Authority involving the construction of the turnpike.

We pointed out that the act which created the Authority authorized it "to construct, maintain, repair and operate the turnpike project." *Id*. at 268, 110 S.E.2d at 397. In *Anderson*, we quoted with approval the following language from the trial court's opinion:

> In a very real sense, the Authority was engaged at every step of the way, in the course of its usual trade, business or occupation, from the preliminary surveys, through the acquisition of the right of way, the construction, and the final operation, maintenance and repair of the turnpike. *The Legislature has so declared by vesting it with the power and charging it with the responsibility of so doing.*

*Id*. at 272, 110 S.E.2d at 400 (emphasis added).

To the same effect is *Williams* v. *Gresham Company*, 201 Va. 457, 111 S.E.2d 498 (1959). There, an employee of the Chesapeake Bay Ferry District was injured while working with an independent contractor on the repair of damaged pilings. The employee sued the contractor. The issue was whether at the time of the injury both the employee and the contractor were engaged in the Ferry District's trade, business, or occupation. In resolving this question, we considered the provisions of the act which created the Ferry District. The Ferry District was authorized "to acquire, construct, operate and maintain a project to provide vehicular and passenger ferry service." *Id*. at 458, 111 S.E.2d at 499.

The facts in *Williams* are similar to those in this case. For example, the evidence established that the Ferry District never owned a crane and never attempted on its own to drive piles. Yet, those facts were not dispositive. Upon consideration of the act which created it, we concluded as follows: "The Commission's powers and responsibilities are clear. When repairs were being

made to the ferry slip and the unfortunate accident occurred, Ferry District was *executing essential duties imposed upon it.*" *Id.* at 465, 111 S.E.2d at 503 (emphasis added).

In our view, the instant appeal is more akin to the *Anderson* and *Williams* cases than it is to those relied upon by Henderson. We note that, to some extent, this case is stronger because in *Anderson* and *Williams* we defined the trade, business, or occupation on the basis of what the governmental entity was *authorized* to do while here the provision of services and facilities is something Centel is *required* to do.

Moreover, the facts and circumstances of this case support the conclusion that springs from the *Anderson-Williams* analysis. There are three facets to the telephone communication system examined in this case: central office equipment, outside plant, and station apparatus. Each facet is but a part of an interrelated whole which makes up the telephone plant. Centel employees do installation work on each part of the telephone plant. However, their work is augmented, as needed, with contract labor. In short, Centel does install central office equipment. It was capable of installing, and had installed, equipment similar to that being installed by Henderson. However, for economic reasons partly related to their union contract, Centel made the business decision to contract out most of the major central office installations. Thus, Henderson relies on these facts to argue that because Centel did not normally install a specific type of central office equipment, installation of such equipment was not part of Centel's trade, business, or occupation. This view is too myopic.

In *Williams*, the Ferry District never used a crane and never drove piles by itself, but driving piles was nevertheless part of its trade, business, or occupation because it was part of maintaining the facility. By the same token, though Centel did not normally install the type of central office equipment that Henderson was installing, the installation of that equipment was nevertheless part of Centel's trade, business, or occupation because it was an addition to the physical plant that Centel was required by law to provide.

For the foregoing reasons, the judgment of the trial court will be

*Affirmed.*