**John A. McCALL, Sheriff and Administrator of the Estate of Mickey Dale Woods, Deceased, Plaintiff,**

v.

**BOWATER, INC., Defendant.**

**Civ. A. No. 86–0188–A.**

United States District Court,
W.D. Virginia,
Abingdon Division.

Aug. 1, 1989.

Christen Wood Burkholder, Bristol, Va., for plaintiff.

William M. Moffet, Abingdon, Va., for defendant.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, Senior District Judge.

The plaintiff is the administrator of the estate of Mickey Dale Woods, a truck driver who was killed in a motor accident on August 6, 1984. The sole issue in this wrongful death action is whether Bowater was a statutory employer of Woods, and thus immune from suit under the Virginia Workers' Compensation Act, Va.Code 65.-1–1 *et seq.* (1987), or whether Bowater is an "other party" under § 65.1–41 (1987), and therefore subject to suit. The Workers' Compensation Act "denies an injured employee the right to recover damages 'against any other party' unless the latter is one not 'employed in the work' in which the employer of the injured employer is engaged." *Bristow v. Safway Steel Products,* 327 F.2d 608, 609 (4th Cir.1964), *quoted in Lane v. Kingsport Armature & Electric Co.,* 676 F.Supp. 108, 109 (W.D.Va. 1988). Bowater asserts it was Woods' statutory employer and has moved for summary judgment.

### I.

The material facts are not in dispute. Woods, the plaintiff's decedent, was a resident of West Virginia, and was employed by a North Carolina trucking company known as Distribution Systems Services (or Distribution Service Systems—the parties disagree). DSS was under contract to defendant Bowater, Inc., a large paper producer, to haul paper to Bowater customers. At the time of his death, Woods was en route from a Bowater mill in Catawba, South Carolina, to Richlands, Virginia, with

a cargo of newsprint. The fatal accident occurred about six miles north of Abingdon, Virginia on U.S. Highway 19. The plaintiff alleges that Bowater had improperly loaded the newsprint, causing the load to shift as Woods rounded a sharp curve, resulting in the wreck. Woods' parents and minor daughter were awarded $56,075 in worker's compensation benefits by the North Carolina Industrial Commission. This action followed.

## II.

The parties agree that, in determining plaintiff's right to bring this suit, the law of Virginia applies. *See McMillan v. McMillan,* 219 Va. 1127, 253 S.E.2d 662 (1979).

In general, Va.Code Ann. § 65.1–40 provides that when an employee and his employer accept the provisions of the Workers' Compensation Act "to pay and accept compensation on account of personal injury or death by accident" the employee and his personal representative, next of kin, et cetera, give up all other rights and remedies "at common law or otherwise" on account of the injury or death. However, § 65.1–41, providing for subrogation of the employer to the employee's rights against third parties ("any other party") has long been interpreted to mean that the employee still possesses a right of action against third parties who are "stranger[s] to the business." *Rea v. Ford,* 198 Va. 712, 96 S.E.2d 92, 95 (1957). The question presented in this case, then, is whether DSS was engaging in the "trade, business, or occupation" of Bowater by shipping the newsprint. *See Buffalo Shook Co. v. Barksdale,* 206 Va. 45, 141 S.E.2d 738 (1965). The Virginia Supreme Court, despairing of ever reaching a totally objective standard for determining the answer to this question, has said that it can only be resolved by examining the facts and circumstances of each individual case. *Bassett Furniture Industries v. McReynolds,* 216 Va. 897, 224 S.E.2d 323, 326 (1976).

Bowater's position is that it is engaged not only in the manufacture but the delivery of paper and paper products to its customers throughout North America. It is undisputed that it is industry practice for paper manufacturers to be responsible for the delivery of their products to their customers. Although Bowater actually subcontracts all of its deliveries to outside companies, with their own equipment and employees, Bowater includes the price of delivery in its list prices, and evidently charges a flat rate regardless of the distance from mill to customer. Delivery, Bowater maintains, is an integral part of its business, and therefore DSS cannot be a "stranger" to Bowater's "trade, business, or occupation."

For support, Bowater cites *Floyd v. Mitchell,* 203 Va. 269, 123 S.E.2d 369 (1962), and *Conlin v. Turner's Express,* 229 Va. 557, 331 S.E.2d 453 (1985). In *Floyd,* the defendant, Mitchell, was an employee of a trucking company under contract to the decedent Floyd's employer, Glamorgan Pipe and Foundry Co. Mitchell, who had accidentally run over the decedent, operated a tractor belonging to the trucking company. His tractor would be attached to trailers belonging to Glamorgan, and the trailers would then be loaded by Glamorgan employees, using Glamorgan equipment, with cast iron pipe. Mitchell gave directions to insure that the load was properly distributed. He would then drive the trailer over to a parking place, still on Glamorgan property, where it would be picked up by other truckers working for Mitchell's employer for delivery. Mitchell never left Glamorgan's premises. He testified that "It was just a situation where I worked with the foundry.... I was loading [trailers] and dispatching them. That was my job." 123 S.E.2d at 370.

Based on these facts, the court held that the work being done by Mitchell was a part of Glamorgan's trade, business, or occupation. 123 S.E.2d at 372. The court found that Glamorgan was in the business of manufacturing pipe "and selling and shipping it to its customers. Transporting the pipe ... was a necessary element of this business. The loading of the pipe ... was an essential element [of transporting

it].... Glamorgan contracted with [the trucking company] to transport the pipe to Glamorgan's customers, a part of Glamorgan's business which Glamorgan could have done with its own employees and its own equipment had it determined that to be a better way." *Id.* Therefore, the wrongful death action against Mitchell and his employer was dismissed.

In *Conlin v. Turner's Express*, the plaintiff, an employee of Ford Motor Company, was injured when she drove a forklift into a trailer owned by Turner's. Turner's was under contract to Ford to deliver machinery and parts between various Ford plants. 331 S.E.2d at 454-5. The Virginia Supreme Court, citing *Floyd v. Mitchell*, held that the transfer of these items was an essential element of Ford's business, and Turner's was therefore not an "other party" liable in a tort action. *Id.* 331 S.E.2d at 455.

The plaintiff, in contrast, relies upon a line of cases beginning with *Shell Oil Co. v. Leftwich*, 212 Va. 715, 187 S.E.2d 162 (1972). Here, Leftwich was employed by the lessee of a Shell service station. While making a service call in the lessee's wrecker, he was struck and seriously injured by a C & O freight train. In concluding that the accident "did not arise out of and in the course of ... performing Shell's work," 187 S.E.2d at 168, the court relied, *inter alia*, on 1A A. Larson, The Law of Workmen's Compensation, § 49.12, where it is stated:

> [T]he test is not one of whether the subcontractor's activity is useful, necessary, or even absolutely indispensable to the statutory employer's business, since, after all, this could be said of practically any repair, construction, or transportation service. The test (except in cases where the work is obviously a subcontracted fraction of a main contract) is whether this indispensable activity is, in that business, *normally* carried on through employees rather than independent contractors.

*Id.* 187 S.E.2d at 167 (emphasis supplied by the court).

After examining the evidence, the court concluded "that while the sale of gasoline was indispensable to Shell's business, such sale to the consumer [sic] public was an activity which Shell did not normally carry on through its employees—and that this determines its liability under Code § 65.129 [now 65.1-29]." *Id.* at 168.

The applicability of *Shell* on one hand and *Floyd* and *Conlin* on the other goes to the heart of this particular case. As Bowater points out, under *Floyd* and *Conlin* the delivery of its products is clearly an essential element of its business, which was being carried out by DSS. Therefore, Bowater was the decedent's statutory employer and his estate cannot recover anything more than the workers' compensation benefits already awarded. However, if the *Shell* analysis is employed, as the plaintiff urges, the fact that DSS was performing an essential activity for Bowater would only begin the inquiry. The dispositive question would be whether Bowater normally shipped its products using its own employees—and this Bowater concedes it never does. Therefore, Bowater would be an "other party" and subject to a wrongful death claim.

### III.

There is no escaping the fact that the approach used in *Floyd* is in direct conflict with the standard set out in *Shell*. If these were the only two cases on the subject, this court would accept the *Shell* analysis as controlling, since it is the more recent case, and, one would think, impliedly overrules *Floyd*. *Conlin*, though, is a 1985 case in which the Virginia Supreme Court not only relied on *Floyd* but failed to mention *Shell* even in passing. Any doubts that this might have created about the continuing validity of *Shell*, however, were put to rest by the court's opinion in *Henderson v. Central Tel. Co. of Virginia*, 233 Va. 377, 355 S.E.2d 596 (1987), in which the *Shell* test was quoted and approved, although declared to be inapplicable to the defendant telephone company. The court said:

> The *Shell Oil Co.* test has never been applied by this Court in a case involving either a public utility or a governmental entity. This is so for good reason. The test is merely an approach that is useful

in determining an entity's trade, business, or occupation. It is not designed for every situation. It works best in cases involving private businesses because those entities often define their trade, business, or occupation by their conduct. With regard to such entities, what they do on a day-to-day basis provides a reasonably reliable indicator of their trade, business, or occupation.

355 S.E.2d at 599.

Since we are not dealing here with a public utility or government "entity" this court takes it that the latest word from the Virginia Supreme Court is that the *Shell* test is applicable to determine whether Bowater is an "other party." *See also Rasnick v. Pittston Co.*, 237 Va. ——, 379 S.E.2d 353, 355 (1989) ("Under Virginia law, the test continues to be whether the act complained of relates to the business of the employer").

### IV.

As the court noted in Section II of this opinion, Bowater concedes, in the affidavit of John C. Davis, President of Bowater's Pulp and Paper Group Sales Division, that its deliveries are always made by common carrier, except for a tiny fraction picked up at the mills by the customers. Bowater is not engaged in the actual shipping of its products. Although much is made in the Davis affidavit and in Bowater's brief of an industry practice of including shipment in the price of the goods, this datum is irrelevant to the question of whether, under the *Shell* test, "this indispensable activity is ... normally carried on through employees rather than independent contractors."

Apart from government entities and public utilities, the test is subject to one exception: "where the work is obviously a subcontracted fraction of a main contract." *Shell*, 187 S.E.2d at 167. Examples of subcontracted fractions are found in *Cooke v. Skyline Swannanoa, Inc.*, 226 Va. 154, 307 S.E.2d 246 (1983), and *Smith v. Horn*, 232 Va. 302, 351 S.E.2d 14 (1986). In the former, a lessee and operator of a restaurant in a Holiday Inn was found to be operating a fraction of the main Inn business, since all Holiday Inns are required to have restaurants. 307 S.E.2d at 249. In

the latter, contract coal operators were found to be doing essentially the same work—mining, processing, and selling coal—as the company which had issued the contract. The subcontractors were therefore carrying out a fraction of the main business. 351 S.E.2d at 17–18. But DSS was not engaged in any fraction of Bowater's business of making paper.

The language employed in *Floyd* suggests that the shipment of products to customers is a necessary element of any business, and one that a manufacturer could itself perform if it wanted to; *ergo*, any subcontractor's employee performing this job is a statutory employer of the manufacturer. This reasoning was implicitly repudiated in *Shell*, although the court did not acknowledge it, when it was pointed out that "the test is not one of whether the subcontractor's activity is useful ... or even absolutely indispensable ... since, after all this could be said of practically any repair, construction, or transportation service." 187 S.E.2d at 167. Therefore, this court considers *Floyd* to be no longer good law, its citation in *Conlin* notwithstanding.

*Conlin* dealt not with the delivery of finished goods but with the intracompany transfer of parts from one Ford factory to another. 331 S.E.2d at 454–5. On this basis, the transfer could be considered an integral part of the manufacturing process, although it still seems to this court that Ford's "business" is not shipping. Be that as it may, the *Conlin* court reaffirmed two earlier decisions holding that "one who merely delivers" materials to a job site is not engaged in the trade of the builder. *Hipp v. Sadler Materials Corp.*, 211 Va. 710, 180 S.E.2d 501 (1971); *Burroughs v. Walmont*, 210 Va. 98, 168 S.E.2d 107 (1969). By the same token, who who merely delivers finished paper products is not a paper manufacturer.

The defendant's motion for summary judgment will therefore be denied.

An appropriate Order will enter this day.