COURT OF APPEALS OF VIRGINIA

Present:  Judges Humphreys, McCullough[*] and Senior Judge Haley
Argued at Fredericksburg, Virginia

CHARLES STATON

                                                          OPINION BY
v.       Record No. 1304-15-4                   JUDGE JAMES W. HALEY, JR.
                                                          APRIL 5, 2016

THE BROTHERS SIGNAL COMPANY AND
  COMMONWEALTH CONTRACTORS GROUP
  SELF-INSURANCE ASSOCIATION

            FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

        W. David Falcon, Jr. (Chasen & Boscolo, P.C., on brief), for
        appellant.

        Eric J. Berghold (McCandlish & Lillard, on brief), for appellees.

        Charles Staton ("claimant") appeals the determination of the Workers' Compensation

Commission ("the Commission") that his left knee injury was the expected result of his failure to

follow medical advice, and therefore was not an injury by accident.  Claimant argues that no

credible evidence supports the Commission's decision that he was under any medical restrictions at

the time of his accident.  In the alternative, claimant contends that, even assuming that he was

subject to medical restrictions, no credible evidence supports the Commission's finding that he

intentionally violated those restrictions.

        We agree with claimant.  For the following reasons, we reverse the Commission's decision

and remand the case to the Commission to enter judgment consistent with this holding.

---

        [*] Justice McCullough participated in the hearing and decision of this case prior to his
investiture as a Justice of the Supreme Court of Virginia.

Background

On appeal from a decision of the Commission, we review the evidence in the light most favorable to The Brothers Signal Company and Commonwealth Contractors Group Self-Insurance Association (collectively "employer"), the parties prevailing below. Lynchburg Foundry Co. v. Goad, 15 Va. App. 710, 712, 427 S.E.2d 215, 217 (1993). So viewed, the evidence proved that claimant worked as a field superintendent for employer. In that capacity, he oversaw work crews, "laid out" the jobs, and dealt with contractors and the Virginia Department of Transportation. He also walked around the job sites.

Claimant began working for employer in November 2009. Kenneth Larsen, his supervisor and employer's general manager, had worked with claimant for a previous employer. In their prior jobs, claimant was a crew chief for Payne's Parking Designs, and Larsen was an assistant operations manager. Claimant had worked as a crew chief for approximately ten years when Larsen, who was then working for employer, approached him and hired him. Larsen was unaware of any restrictions on claimant's work duties. While Larsen noticed claimant "may have favored" his left leg "a little bit," his leg "did not have any impact on his ability to do the job [he was] hired . . . to do."

On the morning of February 18, 2014, claimant and Larsen attended a meeting with the power company at a job site near Zion Crossroads. The job site involved changing all of the bridge ramps from Interstate 64 onto Route 15. The electrical supply for the signals and lighting was to be placed at the top of a hill, and after the meeting, claimant and Larsen walked down the hill together.

At the base of the hill was an excavated drainage ditch adjoining the road. When claimant and Larsen reached the bottom of the hill, they stepped together across a recently excavated drainage ditch onto the ten-foot wide shoulder between the ditch and the road. The

shoulder was muddy, but had no visible holes. When claimant and Larsen stepped onto the mud, they both sank in the "quicksand"-like soil. Claimant, who stepped onto the shoulder with his left leg, sank in the mud fourteen to fifteen inches. He continued to go forward, but his leg did not come out, causing his knee to "buckle" and "hyperextend." Claimant "felt an extreme sharp pain and a pop." When claimant pulled his leg out of the soil and attempted to stand up, he fell back down again.

Larsen's leg also sank in the mud, but he pulled his leg out without injury. Larsen helped claimant get to claimant's truck, and claimant remained in the truck for the rest of the day. Claimant felt pain for the rest of the day whenever he attempted to walk and noticed his knee was "tight" and "swelling up."

Claimant went to the emergency room the following day. X-rays revealed "medial compartment narrowing," but no fracture. Two days later, on February 21, 2014, claimant followed up with his internist, Dr. Joseph David. Dr. David noted the knee was "swollen and a [sic] knot." While claimant could walk, his knee was "very painful" and claimant had increased his pain medications. Dr. David referred him to an orthopedic specialist, Dr. Kevin Peltier.

When claimant saw Dr. Peltier on March 7, 2014, Dr. Peltier did not think he had torn his ACL, but based upon the x-rays taken on February 19, 2014, Dr. Peltier noted he had "essentially bone-on-bone osteoarthritis of the medial compartment, with joint space narrowing of the lateral compartment, and spurring . . . ." Dr. Peltier concluded that the injury to his left knee had "exacerbated his osteoarthritis" and that he had "endstage osteoarthritis." Dr. Peltier did not think claimant would be a good candidate for surgery other than total knee replacement.

Dr. Peltier did not impose any work restrictions on claimant. Instead, he noted, "He is a supervisor and is in his truck a lot, he has been doing his regular job, and he can continue with his work." Dr. Peltier gave claimant a cortisteroid injection and told him to return in four weeks.

Claimant also saw Dr. David on March 7, 2014, in follow up to his emergency room visit on February 19, 2014. Dr. David made no mention of claimant's knee or any restrictions associated with his accident.

On May 12, 2014, claimant underwent an MRI of his knee. Following the MRI, Dr. Peltier recommended a total knee replacement and referred him to Dr. Meyer. Dr. Meyer concluded claimant had an "internal derangement of the left knee superimposed on pre-existing injuries and surgeries" and that claimant was unfit to work. Employer terminated claimant in June 2014.

Prior to his accident in February 2014, claimant had left knee problems dating back nearly thirty years. He initially injured his knee in 1984, and reinjured it in 1994 when he tore his ACL while working for a utility line locating service. His orthopedic surgeon, Dr. Robert Dart, noted that claimant "had done quite well" up until the 1994 accident and had not been seen since 1990. Following Dr. Dart's surgical repair of the ACL in late 1994, he observed that claimant's "instability symptoms had markedly improved." However, prior to releasing claimant in August 1995, Dr. Dart expressed concern about claimant returning to his employment with the utility line locating service. Dr. Dart stated that

> I think he could benefit from another six weeks or so of physical therapy. *I have also discussed with him my concerns that if he returns to a job that involves walking on unlevel terrain, that he would be at risk for a re-injury to the knee or possibly something else if he fell.* This concern of mine is based on the intra-operative findings of arthritis as well as the fact that his medial meniscus has been partially resected. I would not feel comfortable in recommending to his employer that he return to the type of employment that would put him at risk and which in turn would put his employer at risk for [sic] a liability standpoint. *He certainly may do any other types of jobs at present which do no[t] involve ambulation on unlevel terrain.*

(Emphasis added.)

On November 29, 1995, claimant returned to Dr. Dart at the request of claimant's attorney for "evaluation of his physical status regarding his left knee." Dr. Dart's evaluation revealed that

> [t]he ACL reconstruction seems to be functioning quite well and I would have to assume that if he still had an ACL deficient knee his symptoms would be much worse. I discussed this with him at length. *It is my opinion that he is not fit to return to his previous job as an underground utility locator because of the requirement that he walk on unlevel terrain and be on his feet most of his work day.* This would be incapable [sic] with his condition of medial compartment arthritis which I would expect to gradually deteriorate over time. I would not be surprised if Chip would need a knee replacement prematurely and have strongly advised him to lose weight down to 200 pounds if possible. His weight is in the upper 200 pound range at present. This was all discussed with him.

(Emphasis added.) Following his ACL surgery, claimant left his job with the utility line locating service and began working as a crew chief for Payne's Parking Designs.

Although claimant changed jobs, in 2008 he injured his left knee again when he stepped in a hole while hunting. On this occasion, Dr. Dart performed arthroscopic surgery for a torn medial meniscus in his left knee. When claimant returned to Dr. Dart on May 23, 2008, following the surgery, he told Dr. Dart his knee felt "much, much better than it did prior to his surgery." Dr. Dart recommended that claimant lose weight and noted that he

> will use a cane or a walking stick when in the woods or on long distances, continue with his exercise program, and use good judgment in regards to his knee. He may be discharged from my care at this point with the advice that he call or return if he has any problems.

Dr. Dart made no mention of avoiding uneven terrain or changing his job duties. Following the 2008 injury and surgery, Dr. Dart retired, and claimant did not see an orthopedic surgeon again until his February 2014 accident.

Claimant filed a claim for benefits on June 13, 2014. He sought medical benefits and temporary total disability benefits beginning June 21, 2014, and continuing indefinitely. Following an evidentiary hearing on December 8, 2014, the deputy commissioner concluded claimant was not entitled to benefits because he did not sustain an "unexpected 'injury by accident.'" The deputy reasoned that claimant's knee injury was "not medically unexpected" because claimant "did not follow reasonable adherence to his physician's repeated instructions" to "stay off of unlevel terrain" and to "use a cane or walking stick when in the woods or on long distances."

On review, the full Commission affirmed by a split vote. Relying on Carpet Palace v. Salehi, 26 Va. App. 357, 494 S.E.2d 870 (1998), the Commission concluded that claimant's injury "d[id] not qualify as an accidental injury because it was the expected result of the claimant's failing to heed his physician's multiple recommendations." Staton v. The Brothers Signal Company, JCN VA00000894747 (July 6, 2015). The Commission noted that

> Dr. Dart had, on numerous times over many years, stated that the claimant would be at added risk if he walked on unlevel ground as a result of the arthritis and partial resected medical meniscus in his knee. While the claimant argues that this was not a physical restriction, we disagree. It is obvious that advising a patient to avoid unlevel ground is equally as specific as advising a patient to avoid lifting over 50 pounds. In both cases, the physician has determined that a patient, because of an injury, was at risk for future injury if certain activities were performed, and the patient was instructed not to perform such activities.
>
> . . . .
>
> Given the numerous warnings given by Dr. Dart to the claimant that he risked injury by walking on unlevel terrain, we find that the claimant's injury, caused by walking on unlevel terrain, was the expected result of his conduct, and thus not "accidental" and not compensable.

Id.

- 6 -

The dissenting commissioner rejected the majority's analysis on the ground that "the treating physician's statements were advisory, not prohibitory." Id. The dissenting commissioner concluded that Dr. Dart's statements to claimant were "not clear restrictions" and "were not indicated to be permanent." Id. The commissioner emphasized that, at the time of the accident in 2014, claimant had received no advice from Dr. Dart since 2008, and had worked without difficulty for employer for four years. Unlike the current and "express, specific medical restrictions[]" in Salehi, the commissioner concluded that

> [t]he temporally remote and generalized advisory statements of the claimant's physician were not specific restrictions which the claimant voluntarily violated and which caused his February 18, 2014 injury.

Id. The commissioner also pointed out that Salehi was distinguishable because Salehi admitted that he violated his medical restrictions, while claimant did not. Id.

This appeal by claimant followed.

Analysis

On appeal, claimant asserts that no credible evidence supports the Commission's decision that his injury was the expected result of violating his medical restrictions. He maintains that he was not under any medical restrictions at the time of his accident and that the "restrictions" relied upon by the Commission were recommendations communicated by his treating physician twenty years ago, and were not permanent. Furthermore, claimant contends that no evidence supports the Commission's decision that he intentionally violated his doctor's orders because he did not know the condition of the ground at the time he sank in the mud and injured himself.

We begin our analysis by noting that "that the Workers' Compensation Act 'is highly remedial[,]'" Corporate Res. Mgmt. v. Southers, 51 Va. App. 118, 126, 655 S.E.2d 34, 38 (2008) (*en banc*) (quoting Henderson v. Cent. Tel. Co., 233 Va. 377, 382, 355 S.E.2d 596, 599 (1987)),

- 7 -

and we "liberally construe[] [it] to advance its purpose . . . [of compensating employees] for accidental injuries resulting from the hazards of the employment[,]" id. (quoting Henderson, 233 Va. at 382, 355 S.E.2d at 599). Accord Masonite Holdings, Inc. v. Cubbage, 53 Va. App. 13, 19-20, 668 S.E.2d 809, 812 (2008). See also Lynchburg Foundry Co. v. Irvin, 178 Va. 265, 269-70, 16 S.E.2d 646, 648 (1941) ("The expression[] 'injury by accident' . . . ha[s] given rise to many legal controversies[,] [but] [t]ime after time we have expressly held that [it] should be liberally construed in favor of the workmen to carry out the humane and beneficent purposes of the Act." (citations omitted)).

Here, the Commission concluded that claimant did not suffer a compensable "injury by accident" because his injury was an expected result of his failure to follow medical advice. The issue of whether a claimant has suffered an injury by accident is a mixed question of law and fact. Goodyear Tire & Rubber Co. v. Harris, 35 Va. App. 162, 167, 543 S.E.2d 619, 621 (2001). "On appellate review, the factual findings of the Commission are binding if they are supported by credible evidence." Wagner Enterprises, Inc. v. Brooks, 12 Va. App. 890, 894, 407 S.E.2d 32, 35 (1991). This Court "does not retry facts, reweigh . . . the evidence, or make its own determination of the credibility of the witnesses." Id. However, "whether those [factual findings of the Commission] prove the claimant suffered an 'injury by accident' is a question of law" which the Court reviews *de novo*. Goodyear Tire, 35 Va. App. at 168, 543 S.E.2d at 621.

"The basic and indispensable ingredient of 'accident' is 'unexpectedness.'" Salehi, 26 Va. App. at 361, 494 S.E.2d at 872 (quoting 2 Arthur Larson, Workers' Compensation Law § 37.20 (1977)). Thus, as we noted in Salehi, "[t]he Workers' Compensation Commission has denied compensation to workers whose disregard of medical restrictions resulted in predictable injuries." Id. at 362 n.1, 494 S.E.2d at 873 n.1. The underlying rationale for this principle is that "[t]he Workers' Compensation Act does not contemplate benefits for injuries voluntarily

- 8 -

inflicted." Id. at 362, 494 S.E.2d at 872. We have recognized, however, that the instances in which an employee's conduct is so egregious as to be tantamount to actions resulting in a self-inflicted injury are relatively rare. See id. ("Although 'few people intentionally persist in a line of conduct that expectedly results in personal injury . . . such cases can be found." (quoting Larson, supra § 38.83(f))).

Cognizant of these principles, we hold that medical restrictions must be clearly communicated and specific before a claimant's violation of such restrictions may bar the recovery of benefits. Generalized medical admonitions are insufficient.[1] See e.g., Wong v. New View Electrical, VWC File No. 191-52-36 (June 21, 2000) (awarding benefits even though employee continued to work as an electrician pulling cable after doctor cautioned him to find another line of work to avoid further back problems where doctor expressed "hope" he would heed her advice). By the same token, when a medical restriction has been communicated to an employee, the evidence must clearly demonstrate that the violation of the specific restriction caused the employee's injury. See Harris v. Woodgrain Millwork, VWC File No. 221-07-50 (Oct. 6, 2006) (employee pulling molding did not clearly violate restriction against lifting more than fifteen pounds, despite refusal of employee's treating physician and other doctors to treat employee for his perceived "noncompliance" with instructions); Bernard v. Stanley Furniture, VWC File No. 207-34-39 (Aug. 4, 2003) ( while employee had a lifting restriction due to an earlier wrist injury, recovery for new shoulder injury was not barred when it resulted from

---

[1] As the dissenting commissioner recognized below, the "expected result" concept articulated by Salehi must be read narrowly so as to advance the legislative intent behind the Workers' Compensation Act. Staton, JCN VA00000894747. A broad interpretation carries with it the danger of introducing fault-based concepts such as assumption of risk and contributory negligence into workers' compensation jurisprudence, concepts that have been abolished by the Workers' Compensation Act. Id. (citing Uninsured Employer's Fund v. Keppel, 1 Va. App. 162, 164-65, 335 S.E.2d 851, 852 (1985); Roller v. Basic Const. Co., 238 Va. 321, 327, 384 S.E.2d 323, 235 (1989) (other citations omitted)).

- 9 -

pulling a piece of wood rather than lifting).  See also Jackson v. Food Lion, LLC, VWC File No. 211-01-44 (Apr. 10, 2009) ("[T]he medical evidence d[id] not support a finding that [claimant's] chronic pain [wa]s due to a violation of a specific restriction," and "[a]lthough much was made of [claimant] 'exceeding' her [lifting] restrictions, there was little clear evidence of such activity.").

Applying the foregoing principles to the facts here, we conclude that Dr. Dart's instruction to claimant to avoid walking on uneven ground, communicated to claimant fifteen to twenty years prior to his accident, as well as predating further knee surgeries and treatment from other medical care providers who released claimant to return to work without restriction, was not sufficiently specific to justify the preclusion of benefits based upon claimant's violation of them. The record indicates claimant changed jobs in apparent compliance with Dr. Dart's advice, and, at the time he was injured, he was working in a supervisory capacity with employer.  Nothing in the record supports the conclusion that Dr. Dart expected claimant to refrain from ever walking down a hill or a set of stairs.  On the contrary, Dr. Dart's final instructions to claimant were simply to use "good judgment."

Following Dr. Dart's final instructions, claimant was treated by multiple physicians. Those physicians, including the orthopedic specialist who evaluated him immediately after his accident, did not restrict claimant's work activities in any way.  On the contrary, Dr. Peltier stated claimant could "continue with his work."  Claimant continued to work for employer until his MRI in May 2014 established he was physically unable to perform his job duties.

In any event, even assuming that Dr. Dart's instructions were sufficiently specific and clear to constitute ongoing medical restrictions and that claimant violated the restrictions when he walked down the hill and stepped across the ditch, the evidence failed to prove that claimant's violations caused his knee injury.  Instead, the evidence is undisputed that claimant injured his

- 10 -

knee *after* he had walked down the hill and did not result from taking a broad stride across the ditch (assuming a broad stride is the equivalent of walking on an uneven surface). Claimant injured his knee by placing his foot on soil that concealed a hidden hazard – the presence of soil so soft that it was likened to "quicksand." Only when claimant's leg sank in the soil and threw him forward, causing his knee to hyperextend, did claimant sustain an injury. Thus, the evidence did not support the Commission's conclusion that claimant's injury was "caused by walking on unlevel terrain, was the expected result of his conduct, and thus [was] not 'accidental' and not compensable." Staton, JCN VA00000894747.

While employer maintains that Salehi governs the outcome of this case, Salehi is distinguishable in two respects. First, Salehi involved a specific medical restriction. Following surgery for a back injury resulting from lifting a heavy roll of carpet, Salehi was restricted from "lifting over twenty-five pounds." Salehi, 26 Va. App. at 359, 494 S.E.2d at 871. Despite this specific restriction, Salehi did exactly that when he moved a "large box of carpet samples." Id.

Second, unlike claimant, Salehi acknowledged that he violated the twenty-five-pound lifting restriction when he moved the box and that, as a result of that violation, he injured his back. Id. at 356-60, 494 S.E.2d at 871. He admitted, "Unfortunately I do the same thing expecting different results." Id. at 360, 494 S.E.2d at 871. The Court reversed the Commission's award of benefits to Salehi after concluding that the injury in 1994 "predictably resulted from his failure to comply with ongoing medical restrictions." Id. at 361, 494 S.E.2d at 872. Reasoning that "[t]he Workers' Compensation Act does not contemplate benefits for injuries voluntarily inflicted," the Court concluded that Salehi's "injury was the expected result of an activity that violated the doctor's specific restrictions and does not constitute an injury by accident." Id. at 362, 494 S.E.2d at 872-73 (footnote omitted).

Here, the Commission concluded that claimant's injury was an "expected" result of his failure to heed his physician's activity restrictions. Specifically, the Commission found he ignored Dr. Dart's instruction from fifteen to twenty years earlier to avoid walking on "uneven ground." However, claimant was not walking on uneven ground at the time he injured his knee. On the contrary, he had successfully navigated his way down a hill without sustaining any injury at all. He stepped across a ditch onto ground that, by all appearances, presented no danger at all by virtue of being "uneven." Although it was a muddy area that had just been excavated, claimant confirmed during his deposition that no hole was visible in the area where he placed his foot. If the ground had not been the consistency of quicksand on the other side of the ditch, claimant would not have been injured. Claimant would have sustained this injury if he had simply been walking alongside the road and had never walked down the hill or stepped over the ditch. Thus, even assuming he violated a medical restriction *prior* to stepping on the mud, his violation is not what caused his injury. What caused his injury was a hazard hidden in the mud, a hazard that neither he nor his supervisor reasonably anticipated.

Stated simply, to warrant the denial of benefits, the evidence must prove more than the employee's violation of a medical restriction; it must also prove that the violation is the activity that caused employee's injury.[2]

Accordingly, even assuming that claimant violated his medical restrictions by walking down the hill, or by stepping across a ditch, no credible evidence supports the Commission's finding that his violation predictably resulted in the injury to his knee. Instead, his injury was, in the true sense of the word, an "accident." See Irvin, 178 Va. at 270-71, 16 S.E.2d at 648.

---

[2] We have also recognized that the injury sustained by the employee must be the type of injury the restriction was designed to prevent. See Dollar General Store v. Cridlin, 22 Va. App. 171, 178, 468 S.E.2d 152, 155 (1996) (affirming benefits because employee's shoulder injury was not one the restriction was intended to avoid).

Conclusion

For these reasons, we hold the Commission erred in denying medical benefits and temporary total disability benefits to claimant on the basis that his knee injury on February 14, 2014 was the expected result of an activity that violated his medical restrictions and did not constitute an injury by accident. Accordingly, we reverse the Commission's decision and remand the case to the Commission to enter judgment consistent with this holding.

Reversed and remanded.