COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:  Judges Decker, AtLee and Malveaux
Argued at Richmond, Virginia


SURGCENTER OF SILVER SPRING, LLC

MEMORANDUM OPINION[*] BY
v.      Record No. 0846-16-2          JUDGE MARY BENNETT MALVEAUX
JANUARY 31, 2017

MICHAEL & SON SERVICES, INC. AND ACCIDENT
 FUND INSURANCE COMPANY OF AMERICA


FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

Bradley P. Marrs (Marrs & Henry, on briefs), for appellant.

Katharina Kreye Alcorn (Midkiff, Muncie & Ross, P.C., on brief),
for appellees.


The Virginia Workers' Compensation Commission denied SurgCenter of Silver Spring's

application for unpaid medical bills related to treatment of an employee of Michael & Son Services.

On appeal, SurgCenter ("provider") argues that the Commission erred both by failing to apply a

presumption that it billed for a reasonable amount and by finding that Michael & Son ("employer")

would have rebutted that presumption. Because credible evidence supported the Commission's

finding that employer rebutted provider's presumption, we affirm.[1]

I. BACKGROUND

We review the evidence in the light most favorable to employer, the prevailing party

before the Commission. Staton v. Bros. Signal Co., 66 Va. App. 185, 188, 783 S.E.2d 539, 540

(2016). In June 2014, Dr. Aminullah Amini performed surgery at provider's Maryland-based

_____

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Because we base our decision solely on the Commission's finding that employer
rebutted the presumption, we do not address the presumption's applicability.

ambulatory surgical center to treat the persistent back pain of James Brewer, one of employer's employees. Three months later, Brewer filed a claim for benefits under the Virginia Workers' Compensation Act.[2] Provider billed employer and its insurance carrier for $125,760.60 in fees associated with providing the facility for Brewer's surgery as well as the surgical implant.[3]

When employer initially refused to pay the facility for Brewer's surgery, provider asked the Commission to award it the remaining charges. In support of its application, provider submitted its bill, which itemized the various services and supplies by both revenue code and CPT code. Provider also provided a copy of Dr. Amini's operative report, in which he described the surgery and the procedures he performed. After employer paid $42,492.60, provider amended its claim to seek the outstanding balance of $83,268. A deputy commissioner conducted a hearing on-the-record regarding the amended claim.

During the hearing, provider relied on its bill as *prima facie* evidence that its charges were both reasonable and necessary. In response, employer submitted evidence of alleged billing irregularities to refute the presumption that the bill's charges were reasonable and necessary. Employer also submitted the affidavit of Dan Moore, the owner of a business specializing in medical services reimbursement, to prove that provider's charges were excessive.

A. Alleged Billing Irregularities

In its submissions to the deputy commissioner, employer raised a number of challenges to the propriety of provider's charges.[4]

_____

[2] Employer does not contest that the injury arose out of and in the scope of employment.

[3] This amount does not include either the $31,080 charged by Dr. Amini or the $2,730 charged by the anesthesiologist. Neither the medical professionals' surgical charges nor the validity of Brewer's claim are at issue in this appeal.

[4] Employer argued that under the Centers for Medicare & Medicaid Services' guidelines, provider should not have reported CPT codes related to various neuromonitoring procedures along with the codes for the surgery itself. Employer suggested further that provider overbills

- 2 -

Notably, employer submitted evidence indicating that provider erroneously billed for a procedure that was never performed during the surgery. In its billing statement, provider charged $9,500 each for a morselized bone allograft and an autograft. Dr. Donald Hope, a neurosurgeon reviewing the claim on employer's behalf, noticed that Dr. Amini's operative report described only an autograft. Dr. Hope also noted that Dr. Amini's own bill included no charges for an allograft. While Dr. Amini billed twice for CPT 20936, indicating two, separate autografts, his bill does not include a CPT code for a morselized allograft.

Although provider was able to explain most of the alleged irregularities, provider never explained why it billed for the allograft. Rather, provider withdrew the charge and amended the amount it claimed without further comment.

### B. Evidence from Dan Moore Establishing the Prevailing Community Rate

Additionally, employer argued that provider's charges exceeded the prevailing rate among other surgical facilities in the area. In support, employer submitted the affidavit of Dan Moore, an insurance industry expert in medical reimbursement. Moore attested that he surveyed other providers in the area by telephone and reviewed data from the American Hospital Directory and the Healthcare Provider Cost Reporting Information System to ascertain the prevailing rate for similar surgeries in provider's area. He concluded in his affidavit that the prevailing rate for Brewer's procedure at outpatient facilities was $9,960, while the prevailing rate at inpatient facilities was $12,575 per day. He opined that provider's charges exceeded these rates. He also

workers' compensation patients for surgical implants, relying in part on a spreadsheet showing a wide range of charges provider submitted for prosthetic implants between 2011 and the date of the surgery. These arguments were not the basis of the full Commission's findings rebutting the presumption and as such are only pertinent as background to the proceedings before the deputy commissioner.

opined that in his experience, providers typically mark up surgical implants by about 20%.

Provider, by contrast, marked up Brewer's implant by 175%.[5]

In a subsequent deposition, Moore shared his personal belief that "the serious money" in healthcare goes to medical facilities, not doctors, and opined that someone should "hold their feet to the fire" to keep healthcare costs down. He also admitted that his business, which usually bills on a contingency basis, would need to rebate part of its fee to employer's insurer if provider prevailed.

Moore also conceded that his telephone survey "really didn't tell us much." Moore's survey served two distinct purposes: gathering information for this case and finding a new provider to whom the insurer could refer future claimants. And if a survey respondent said that it was not interested in the insurer's referrals, Moore terminated the call without asking what the provider typically charged for these procedures. Consequently, Moore completed "very, very few" surveys for the twenty-four ambulatory surgery centers he contacted. When he did complete a survey, he did not ask the respondent what it typically charged; rather, Moore asked how much the respondent would agree to as payment, from which he inferred what the respondent might charge. Moore ultimately acknowledged in hindsight that he would have preferred to omit the survey from the affidavit.

Moore's deposition did clarify how he calculated the prevailing rate for a spinal fusion. Moore looked to medical cost reports provided by area hospitals to the Centers for Medicare & Medicaid Services and distributed through the American Hospital Directory. From this data, Moore identified four facilities in Maryland and Virginia at which outpatient spinal fusions were

---

[5] Although Moore attested that provider "charged 275% over the invoice cost," this appears to have been either a misstatement or an error of arithmetic. After the implant's vendor invoiced provider for $10,205.40, provider billed employer $28,101.60 for the same implant. Thus, provider charged employer a little more than 275% of the implant's initial cost—a markup of about 175% once the initial cost is subtracted.

performed. For each of these four facilities, Moore determined the number of surgeries performed and the average cost per procedure. He also identified five hospitals at which spinal fusions were performed on an inpatient basis within sixteen miles of provider's facility. For each of these hospitals, Moore determined the total number of procedures performed, the average cost per procedure, and the average length of stay. Moore averaged all of this data together to determine that the prevailing amount charged for 379 spinal fusions was $10,340 per day.[6]

When challenged, Moore testified that his calculations were based entirely on the amount each facility charged, not the amount any facility agreed to accept. He also testified that the information he gleaned from his telephonic survey did not influence his calculations. And he testified that each facility's reported charges would have encompassed all of the CPT codes that provider itemized in its bill.

### C. The Commission's Ruling

The deputy commissioner ruled in employer's favor at the conclusion of the on-the-record hearing. On review, a majority of the full Commission affirmed on two, alternative bases.

First, the Commission found that provider's bill was "not entitled to a presumption of reasonableness." The Commission inferred that by withdrawing its charge for the bone allograft, provider "tacitly acknowledg[ed] that the subject services were not rendered." Finding "no reason to ascribe some presumption of accuracy" to the remaining charges, the Commission found that the bill itself was not *prima facie* evidence that the charges were reasonable and necessary.

Alternatively, the Commission found that employer's evidence rebutted the presumption. Although the Commission acknowledged some "modest variance" in employer's presentation of

---

[6] This result differed from the figures quoted in Moore's affidavit. He explained during his deposition that his affidavit quoted the amounts for certain subsets of facilities.

the prevailing rate, it emphasized that "provider's charges exceed[ed] these calculations by over $100,000."

## II.  ANALYSIS

On appeal, we defer to the Commission's factual findings so long as "credible evidence supports [those] finding[s]." Fredericksburg Orthopaedic Assocs. v. Fredericksburg Mach. & Steel, LLC, 62 Va. App. 83, 87, 741 S.E.2d 813, 816 (2013) (quoting Celanese Fibers Co. v. Johnson, 229 Va. 117, 121, 326 S.E.2d 687, 690 (1985)).  To the extent that our review requires us to interpret the Workers' Compensation Act, "we generally give great weight and deference . . . to the [C]ommission's construction" but "are not bound by [its] legal analysis." Ceres Marine Terminals v. Armstrong, 59 Va. App. 694, 702, 722 S.E.2d 301, 305-06 (2012) (quoting Fairfax Cty. Sch. Bd. v. Humphrey, 41 Va. App. 147, 155, 583 S.E.2d 65, 68 (2003)).

Under the Act,[7] an employer must "furnish or cause to be furnished . . . necessary medical attention" to treat a compensable injury or illness "free of charge to the injured employee."  Code § 65.2-603(A)(1).  The "charges of hospitals" used to treat the compensable injury or illness "shall be subject to the approval and award of the Commission."  Code § 65.2-714(A).  In effect, Code § 65.2-714(A) "give[s] the [commission] the power to pass on . . . [providers'] charges when rendered" so as to prevent medical providers from "overcharg[ing] for their services." Fredericksburg Orthopaedic Assocs., 62 Va. App. at 88, 741 S.E.2d at 816 (alterations in original) (quoting Bee Hive Mining Co. v. Ind. Comm'n, 144 Va. 240, 242, 132 S.E. 177, 177 (1926)).  An employer's liability for a provider's charges is "limited . . . to such

---

[7] In April 2014, the General Assembly amended several sections of the Workers' Compensation Act pertaining to medical providers' reimbursements. See 2014 Va. Acts ch. 670. This amendment took effect in July 2014—one month after the employee's surgery.  The General Assembly has amended the statute several more times since that date, most recently in March 2016. See 2016 Va. Acts chs. 279, 290.

Unless stated otherwise, we will refer to the version of the statute that was in effect in June 2014.  We also will note where statutory language currently is codified as well as any substantive changes that would bear on our analysis.

charges as prevail in the same community for similar treatment when such treatment is paid for by the injured person." Code § 65.2-605.[8]

The Commission may consider the provider's "bill as *prima facie* evidence that [its] charges were consistent with the requirements of the Act." Ceres Marine Terminals, 59 Va. App. at 703, 722 S.E.2d at 306. In effect, this consideration creates a rebuttable presumption that shifts the "burden of proving the excessiveness of the charges" to the employer. Id. at 705, 722 S.E.2d at 307. We have also held that the Commission may refuse to apply the presumption. See, e.g., Fredericksburg Orthopaedic Assocs., 62 Va. App. at 89, 741 S.E.2d at 816-17 (finding that a provider failed to offer evidence explaining why a 40% surcharge for treating a workers' compensation patient was reasonable and necessary in that particular case).

Provider assigns error to the Commission's denial of its claim on six different grounds. In its first assignment of error, provider argues that its decision to withdraw the errant allograft line item did not justify the Commission's decision not to apply a presumption of reasonableness to the remaining charges. The next three assignments of error relate to the Commission's alternative finding that the evidence in Moore's affidavit and deposition rebutted the presumption if it applied. The remaining assignments of error relate to issues not considered by the Commission when it rendered its opinion.[9]

---

[8] This language currently is codified at Code § 65.2-605(B)(1).

[9] We address these briefly here because we find that they are irrelevant to the resolution of this appeal. It will suffice to explain why each of these alleged errors "did not affect the ultimate conclusion" in the case. Monahan v. Obici Med. Mgmt. Servs., 271 Va. 621, 632 n.10, 628 S.E.2d 330, 338 n.10 (2006).
In its fifth assignment of error, provider contends that the Commission erred by failing to address its unrebutted evidence regarding the appropriateness of its neuromonitoring charges. The propriety of these charges might be in issue if the data underlying Moore's calculations excluded neuromonitoring. Moore testified during his deposition, however, that the data he relied on would have encompassed all of the services for which provider billed, including neuromonitoring. We find nothing in the record that qualifies or disputes his assertion.

We need not decide whether the Commission erred by not applying the provider's billing presumption because we agree that the employer's evidence would have rebutted that presumption in any case. Cf. WLR Foods v. Cardosa, 26 Va. App. 220, 229 n.2., 494 S.E.2d 147, 151 n.2 (1997) (declining to address an argument because the appeal could be resolved on another, alternative basis). See generally Kilby v. Culpeper Cty. Dep't of Soc. Servs., 55 Va. App. 106, 108 n.1, 684 S.E.2d 219, 220 n.1 (2009) ("When a trial court's judgment is made on alternative grounds, we need only consider whether any one of the alternatives is sufficient to sustain the judgment . . . and, if we so find, need not address the other grounds.").

Assuming, without deciding, that the Commission should have accepted provider's bill as *prima facie* evidence that its charges were reasonable, we find that employer's evidence would have rebutted that presumption. Employer relied on Moore to establish that the prevailing rate for a spinal fusion among facilities in provider's community was about $10,340 per day. In response, provider did not directly dispute the accuracy of Moore's calculations. Rather, provider focused on challenging Moore's credibility and the relevance of his underlying data.

Provider now urges us to reverse, arguing that Moore's opinion was not entitled to any weight, that he relied on irrelevant payment data in lieu of billing data, and that he improperly included data from outside the relevant community when calculating the prevailing rate. We reject each of these arguments.

---

In its sixth assignment of error, provider argues that the deputy commissioner ignored its affirmative evidence as to the appropriateness of its medical device charges and that the Commission failed to correct that error. But as the deputy commissioner correctly pointed out, the amount employer paid already exceeds the full amount provider charged for the device plus the prevailing community rate as established by Moore.

Even if we assumed that the Commission's decision not to address these issues was error—which we do not decide—we would conclude that the errors were harmless. "[U]nder the doctrine of harmless error, we will affirm the . . . judgment when we can conclude that the error at issue could not have affected the . . . result." Va. Ret. Sys. v. Cirillo, 54 Va. App. 193, 202, 676 S.E.2d 368, 373 (2009). Thus, we find no reversible error in the Commission's decision not to address these issues.

<u>A.  The Commission is solely responsible for judging a witness' credibility and
determining the weight of his evidence.</u>

In its second assignment of error, provider argues that the Commission should not have

considered Moore's evidence in light of his biases, his lack of expertise, and the methodologies

he used.  These issues go to the weight of Moore's opinion, however, not his competence as a

witness.  The manner in which the Commission weighed Moore's opinion "has nothing to do

with its admissibility."  <u>Seneca Falls Greenhouse & Nursery v. Layton</u>, 9 Va. App. 482, 487, 389

S.E.2d 184, 187 (1990) (holding that the Commission did not err in considering the opinion of an

expert who was not trained as a medical doctor).  And our "well-established standard" of review

does not permit us to "'make [our] own determination of the credibility of the witnesses.'"

<u>Layne v. Crist Elec. Contr., Inc.</u>, 64 Va. App. 342, 345, 768 S.E.2d 261, 262 (2015) (alteration in

original) (quoting <u>McKellar v. Northrop Grumman Shipbuilding Inc.</u>, 63 Va. App. 448, 451, 758

S.E.2d 104, 105 (2014)).

<u>B.  The Commission did not rely on payment data in lieu of charge data.</u>

In its third assignment of error, provider contends that the Commission erred by relying

on data "that was presented as evidence of what payments medical providers may accept . . . in

contrast to the . . . prevailing charges assessed."  We find, however, that the record does not

support the premise of provider's argument.

Although Moore admitted that his telephone survey conflated the amount providers

accept in payment with the amount they initially charged, there is no evidence that this mistake

infected his calculations.  Indeed, provider asked Moore three times whether his calculations

might have included payment data.  And each time, Moore insisted that his calculations included

the amount charged:

> [Provider's Counsel]:  All right.  Now, tell me, of the numbers
> you've just been listing for me, how many of those pertain to the
> amounts initially invoiced by the provider facilities?

[Moore]:  All of it.

[Provider's Counsel]:  So you're telling me that not one of those numbers include any data on the amounts that were paid to the facilities?

[Moore]:  It is the amount charged.

[Provider's Counsel]:  Okay.  And was—so when you came up with this $10,340 number, were you influenced in any way by your telephonic survey?

[Moore]:  No.

In Ceres Marine Terminals, we identified the "ultimate question" as, "What would a [provider] with the skill and experience of those that operated on [the claimant] typically charge for the surgery performed . . . at the time and in the community that the surgery was performed?" 59 Va. App. at 706, 722 S.E.2d at 308.  We held in that case the reimbursement rate in the Longshore fee schedule did not sufficiently answer that question because it "establish[ed] only what the government would pay."  Id. at 706-07, 722 S.E.2d at 307-08.  By contrast, Moore stated without equivocation that his calculations relied only on what the facilities charged.

We thus find that the Commission did not err in relying on the data presented by Moore's testimony.

### C.  The Commission did not err in considering data from outpatient facilities in Richmond and Norfolk.

Provider's fourth assignment of error asserts that the Commission erred by "relying upon data with respect to medical billings from locations outside the pertinent geographic region or regions."  Approximately 350 of the 379 surgeries included in Moore's calculations were performed at facilities located within sixteen miles of provider's facility.  Moore also included some outpatient surgeries from Richmond's VCU Medical Center and Norfolk's Bon Secours DePaul Medical Center.  Each of these facilities is located more than one hundred miles from provider's facility.  Moore explained that he included these facilities because few facilities

- 10 -

generally perform this kind of surgery in an outpatient setting, and he felt he needed a larger sample of outpatient procedures. He selected facilities in Richmond and Norfolk specifically because he believed that the economic communities of Richmond and Norfolk are "probably pretty similar" to Silver Spring, Maryland. Provider argues that including these facilities in Moore's calculations was improper.

Provider's argument overlooks the Commission's Rule 14, which allows the Commission to "determine the appropriate community in the state or territory where the treatment is rendered" when an employee receives treatment outside of the Commonwealth. Va. Work. Comp. Comm'n 14 (2015). Moreover, the Commission "may consider additional data to determine the prevailing community rate" if it deems appropriate. Id. While provider argues on brief that Moore's data should have included only facilities "in the vicinity of Silver Spring," it does not explain why the Commission could not appropriately consider surgery charges in Richmond or Norfolk facilities as additional data under this rule.

Assuming that any error did occur, provider's argument also misses a practical point: if anything, including VCU Medical Center and DePaul Medical Center in these calculations caused Moore to *overestimate* the prevailing community rate for outpatient facilities. The highest average outpatient charge that Moore found within sixteen miles of provider's facility was at MedStar Georgetown University Hospital, which charged patients an average of $9,796 over thirty-five surgeries. By contrast, DePaul Medical Center charged an average of $12,789 over eleven surgeries. VCU Medical Center charged an average of $17,807 over seventeen surgeries. As Moore himself point outed out, including these facilities "actually helped" provider's case.

Even assuming that the Commission erred by considering this data, we conclude that any error was harmless. We thus find no reversible error in the Commission's decision to consider calculations that included data from outside the vicinity of Silver Spring.

### III. CONCLUSION

While we assume, without deciding, that the Commission initially should have presumed that provider's remaining charges were reasonable and necessary, credible evidence supported the Commission's alternative finding that employer rebutted this presumption. We also find no reversible error in the Commission's decision not to address the remaining issues provider raised. We therefore affirm the Commission's ruling.

<u>Affirmed.</u>